(No. 13924.—Decree affirmed.)

LILLIAN BLACKHURST *et al.* Appellees, *vs.* MARY J. JAMES *et al.* Appellants.

*Opinion filed October 21, 1922.*

1. WILLS—*when weakness from old age does not render one incompetent to make will.* Physical and mental weakness due to old age will not necessarily render one incompetent to make a valid will, and if a testator has sufficient mental capacity to knowingly and understandingly dispose of his property and distribute it to those to whom he intends it to go he is competent to make a will.

2. SAME—*when Supreme Court will not reverse decree setting aside will.* Where the testimony in a will case on the issue of testamentary capacity is conflicting and the evidence of the contestants, considered alone, fairly authorizes the verdict, the Supreme Court will not reverse the decree unless it is manifestly against the weight of the evidence, and will be more reluctant to set aside a second verdict after the case has been tried before two juries, each of which found against the will.

3. SAME—*when court setting aside will may also set aside deeds to land in another county.* Where complainants seek to set aside a will and deeds executed on the same day and which were prac-

tically contemporaneous acts of the testator, the court has juris-
diction to grant the relief prayed although the land covered by the
deeds is situated in another county than that in which the suit is
brought, as the decree does not "affect the land" but operates on
the person and removes an obstruction to the enforcement of the
contestants' rights.

4. SAME—*when prior inconsistent will is admissible in behalf
of contestants.* Where a bill to contest a will alleges that the pro-
ponents conspired to cause the testator to make a distribution of
his property beneficial to their interest, a former will and the cir-
cumstances surrounding the execution of codicils at different times,
making changes beneficial to the proponents' interests up to the
time of the execution of the contested will, which completely dis-
inherited the contestants, are admissible as tending to show undue
influence.

5. SAME—*undue influence may be proved by circumstances.*
In a will contest case, undue influence may be proved by circum-
stances, and the feebler the mind of the testator the less evidence
will be required.

6. SAME—*what constitutes undue influence by child of testator.*
The influence of affection or partiality for a child, coupled with
persuasion on the part of the child, is not wrongful in a legal sense
of the term, but will constitute undue influence if it goes to the
extent of depriving the testator of his free agency.

7. SAME—*when undue influence will invalidate a will.* Undue
influence which will invalidate a will must be influence specially
directed to procuring the will favoring particular parties, must be
operative at the time of the transaction, and the will must be made
as the result of such influence and not as the free will of testator.

8. SAME—*when presumption of undue influence must be over-
come by rebuttal evidence.* In a will contest case, evidence clearly
showing that the testator, both physically and mentally, was very
weak from old age, and that he entrusted all his business to his
son-in-law, who was named executor and whose wife was one of
the chief beneficiaries, greatly strengthens the presumption of un-
due influence arising from the fiduciary relation, and such presump-
tion must be overcome by evidence in rebuttal.

9. DEEDS—*when court may set aside a deed to land in another
jurisdiction.* A court of chancery may entertain a bill filed in the
county where the defendant resides, to cancel and set aside deeds
to land lying in another jurisdiction and compel a re-conveyance.

STONE, J., dissenting.

APPEAL from the Circuit Court of Hancock county;
the Hon. HARRY M. WAGGONER, Judge, presiding.

O'HARRAS, WOOD & WALKER, and C. W. WARNER, for appellants.

SCOFIELD, CALIFF & BELL, and HARTZELL, CAVANAGH, MARTIN & HARTZELL, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

William Blackhurst died testate in September, 1918. The will admitted to probate is dated August 3, 1918. The testator was then ninety-two years old and was living with the family of a daughter, Mrs. Alice Huston, in Blandinsville, McDonough county, when the will was executed and when he died. He owned a residence in LaHarpe, in Hancock county, where he resided until he went to live at his daughter's, in March, 1918. He also owned about a thousand acres of land in McDonough and Henderson counties, most of it situate in McDonough county. His wife died in 1916. He left as his only children, Mary J. James, Alice H. Huston and Anna E. Mulloy. He was also survived by four grandchildren, Lillian Blackhurst, Ruby Voorhees, Fred Blackhurst and Lena Grigsby, children of his deceased son Charles; also by a grand-daughter, Luella Blackhurst, only child of testator's deceased son William. The will was admitted to probate in Hancock county, and within the year allowed by the statute for filing contests the four children of testator's deceased son Charles filed a bill to contest the will and set aside its probate. The bill charged the testator was of unsound mind and that he was procured to execute the will by the undue influence of his daughters Mrs. James and Mrs. Huston, and his son-in-law, Charles R. Huston. An issue of fact was made up and submitted to the jury whether the instrument was the will of Blackhurst. The jury returned a verdict that it was not his will. The court entered a decree, in accordance with the verdict, that the instrument was not the will of Blackhurst and set the will and its probate aside. Mrs. James and Mrs. Huston, and Charles R. Huston, one of the executors, appealed from that

decree to this court, where the decree was reversed and cause remanded for a new trial. (*Blackhurst* v. *James*, 293 Ill. 11.) In the opinion filed here, the court went into the evidence of the respective parties at considerable length and reversed the decree on the ground that it was not supported by the evidence. The cause was re-instated in the circuit court of Hancock county for another trial. Contestants, by leave, filed an amended and supplemental bill, by which, in addition to contesting the will, they sought also to set aside two deeds made by the testator the same day he made his will. One of the deeds purported to convey to Mrs. James and Mrs. Huston 100 acres of land in McDonough county, and one of them to convey to Luella Blackhurst 160 acres in Henderson county. The grounds for contesting the deeds were the same as alleged against the will,—unsoundness of mind and undue influence. The answer of the defendants to the amended supplemental bill, in addition to denying all the material charges as to unsoundness of mind and undue influence, denied the right of contestants to combine in one suit the validity of both the will and the deeds. The jury returned a verdict finding the instrument was not the will of Blackhurst. The chancellor sustained the verdict and rendered a decree accordingly, and also found the deeds were invalid by reason of the facts that the grantor was of unsound mind and that he was unduly influenced to make them. They were therefore declared null and void, set aside and canceled. Proponents have again appealed to this court.

Appellants contend (1) the decree is manifestly against the weight of the testimony; (2) there was no evidence of undue influence, and the court erred in not taking that issue from the jury; (3) the court erred in assuming jurisdiction to set aside the deeds in the suit to contest the will because the land described in the deeds was not situate in Hancock county, where the will was probated and the contest suit instituted; (4) the court erred in admitting in evidence a will of Blackhurst made June 2, 1910, and three

codicils to it; and (5) the court erred in the admission of other testimony.

When the cause was here the first time we reversed the decree and remanded the case for a new trial because we were of opinion the decree was manifestly contrary to the weight of the evidence. On the second trial both parties, in addition to the testimony heard on the first trial, introduced testimony not heard on the first trial. They each introduced the testimony of about the same number of witnesses who were acquainted with the testator and had seen and observed him before the will was made, at periods ranging from 1917 to September, 1918. Some of appellees' witnesses described his physical and seeming mental condition and appearance but expressed no opinion as to the soundness of his mind. Some of them, who saw him near the time the will was executed, expressed the opinion that he was not of sound mind. In addition to lay witnesses, appellees introduced the testimony of Dr. Norbury, a physician of large experience in treating people for mental troubles. Dr. Norbury never saw the testator but testified as an expert. In answer to a hypothetical question embracing the case as the appellees' evidence tended to prove, the doctor testified that in his opinion the testator was not of sound mind or memory for the last six months of his life and when the will was made; that his unsound mental condition was due to chronic cerebral atrophy, arteriosclerosis, causing senile dementia. The doctor testified the facts assumed in the question showed the testator suffered from senile dementia, which is an organic disease of the brain and causes a progressive deterioration of the mental faculties. The doctor testified a person so diseased would not be able to retain impressions or memories of recent occurrences but that he would retain memories of earlier events or happenings. Dr. Martin, who testified for appellees, and Dr. Provine, who testified for appellants, on the first trial, died before the second trial. Their testimony, and by agreement

the testimony of Dr. Becum, who testified for appellees on the first trial, was read on the second trial from the transcript. Their testimony was referred to in our former opinion. Dr. Becum, who attended testator in 1916 and 1917, Dr. Martin, a near neighbor and old acquaintance, and Dr. Barker, an acquaintance, testified that in 1916 and 1917 testator was afflicted with senile dementia and that it was progressive, and Drs. Becum and Martin expressed the opinion that he was mentally unsound. Testator left LaHarpe in March, 1918, and went to the Huston home, in Blandinsville, where he resided until his death. Dr. Provine, a witness for appellants, testified that he visited him professionally in March, April, May, August and September of that year, up to the time of his death. He expressed the opinion that he was mentally sound; that he had no definite disease and in the doctor's opinion died of senility and toxæmia; that he had arteriosclerosis to about the degree to be expected in one of his age, and that he seemed a little dull from March to the time of his death. The doctor testified that by the term "sound mind and memory," "I mean simply this: that he would know a thing after he would see it,— that is, he would know his children and grandchildren after he would see them, but after seeing them he would not have enough mind and memory to know what he wanted to do for them. He would simply know them when he would see them, but when he came to doing for them what he wanted to do for them, or anything of that character, I don't think he would have the mental capacity to do it."

It is very apparent from the testimony of the medical witnesses, as well as the lay witnesses, that from 1916 till his death testator's physical condition was very poor and that much of the time his mental condition was markedly bad. There were intervals when both his physical and mental condition improved, but the testimony tends to show that until his death he was feeble in body and mind. Physical and mental weakness due to old age will not necessarily ren-

der one incompetent to make a valid will. Although a person may be physically and mentally weak, if he has sufficient mental capacity to knowingly and understandingly dispose of his property by will and distribute it to those to whom he intends it to go he is competent to make a will. (*Woodman* v. *Illinois Trust and Savings Bank,* 211 Ill. 578; *Pooler* v. *Cristman,* 145 id. 405; *Rutherford* v. *Morris,* 77 id. 397.) We shall not attempt to set out the substance of all the testimony heard. Much of that heard on the first trial is referred to in our former opinion. Considering the testimony then heard and the additional evidence heard at the last trial, we cannot say the decree is manifestly against the weight of the testimony and should be reversed for that reason. While appellants' testimony tended to show the testator possessed testamentary capacity when he executed the will, appellees' testimony tended to show he did not possess testamentary capacity. The weight of the medical testimony is, that testator, who was ninety-two years old, was afflicted with senile dementia, which causes progressive mental decay, and his physical condition was very poor during much of the last two years of his life. His condition improved for short periods at intervals, and although Dr. Provine, who treated him after he went to Huston's in March, until his death, testified he was of sound mind, his description of his mental and physical condition and his definition of what he considered sound mind tend strongly to show his mentality was very feeble. While the testimony on the question of mental capacity was conflicting, that offered by appellees, considered alone, fairly authorized the verdict and decree. In such cases reviewing courts will not reverse a decree unless it is manifestly against the weight of the evidence. (*Carney* v. *Sheedy,* 295 Ill. 78, and cases cited.) There can be no doubt that under the authorities this court now has the power to set aside the verdict and reverse the decree without remanding the case, or to reverse and remand for another trial; but this case has been tried

before two juries, each of which found against the will, and two different judges have approved the verdicts and rendered decrees setting aside the will. In such cases reviewing courts are more reluctant to reverse than where there has been only one verdict. (*Calvert* v. *Carpenter*, 96 Ill. 63; *Egbers* v. *Egbers*, 177 id. 82; *Parmly* v. *Farrar*, 204 id. 38.) If there is no evidence to sustain the verdict a reviewing court will set it aside and reverse the decree, no matter how many juries have found the same way.

Appellants contend the decree of the circuit court setting aside and canceling the deeds of the testator made August 3, 1918, to Mrs. James, Mrs. Huston and Luella Blackhurst was erroneous, because the lands described in the deeds were in McDonough and Henderson counties and the circuit court of Hancock county had no jurisdiction of the subject matter. Section 3 of the Chancery act provides that suits in chancery which "may affect real estate" shall be brought in the county where the same or some part thereof is situated. The will was admitted to probate in Hancock county, and section 7 of the Statute of Wills required a bill to contest it to be filed in that county within one year after its admission to probate. Some of the defendants to the bill to contest the will resided in Hancock county and some of testator's real estate was in that county.

Appellants contend that the suit, in so far as it was sought to set aside the deeds, affected the land in McDonough and Henderson counties, and that the decree setting aside and canceling the deeds was a decree *in rem* and not *in personam,* and therefore void. This court has in many cases held a court of chancery may entertain a bill filed in the county where the defendant resides, to cancel and set aside deeds to land lying in another jurisdiction and compel a re-conveyance. *Enos* v. *Hunter,* 4 Gilm. 211; *Johnson* v. *Gibson,* 116 Ill. 294; *Baker* v. *Rockabrand,* 118 id. 365; *Hayes* v. *O'Brien,* 149 id. 403; *Bevans* v. *Murray,* 251 id. 603.

304—38

Appellants say the order to re-convey operated *in personam* and distinguishes the above cases from the one at bar because here the bill did not ask and the decree did not order a re-conveyance. It would seem that if a bill to set aside and cancel deeds to land in a foreign county "affects the land" and is required to be filed in the county where the land lies, the fact that a re-conveyance was asked and decreed would not operate to make it a suit not affecting the land, but the person, only. To authorize a decree for re-conveyance it is necessary the deeds be ordered canceled and set aside. When does the decree affect the land? It was said in *Bevans* v. *Murray, supra:* "The rule is undoubtedly well established that where land is to be affected by a decree, as in partition proceedings, assignment of dower and foreclosure of mortgages or other liens, the court must be able to control the real estate to be affected or it has no jurisdiction of the case. This is the rule both at common law and under the third section of our Chancery act. Courts of equity, which concern themselves chiefly with property rights, act either upon the property itself or upon the person having the possession, control or title thereto, and whether they accomplish their purpose in the one way or the other depends upon the nature of the proceeding and the character of the relief sought. When it is necessary, to accomplish justice between the parties, to act directly upon the property itself, it is indispensable that the real estate to be affected must be within the territorial jurisdiction of the court. While this is a well established rule, it is also equally well settled that where one is owner of land or other property which is not within the jurisdiction of the court, which in equity and good conscience he ought to convey to another, the party entitled to such conveyance may file a bill in any jurisdiction in which the defendant may be found, and the court may grant the relief by compelling a conveyance to the equitable owner. In such case the decree operates *in personam* and not upon the property involved."

In most of the decided cases, it is true, a re-conveyance was asked in the suit to set aside the deed.  Unless a prayer in the bill for a re-conveyance was necessary to give the court jurisdiction to set aside a deed to land in another county the court had jurisdiction to grant the relief prayed. We are not capable of pointing out any good reason why the court would have jurisdiction if a re-conveyance was asked and would not have jurisdiction if a re-conveyance was not asked.  We find no case expressly holding it necessary to combine a prayer for re-conveyance in the suit to set aside deeds to land in a foreign county in order to give the court jurisdiction.  Appellants place much reliance in *Cooley* v. *Scarlett,* 38 Ill. 316.  In that case the bill was filed in Kane county, Illinois, to set aside a deed to land in Michigan.  The bill alleged the deed was procured from a depositary by fraud and placed on record in Michigan.  The court held that whether the deed was a nullity for the fraud charged depended on the laws of Michigan, which this court could not administer; that the courts of Michigan had the exclusive right to decide upon titles to their own lands.  In *Enos* v. *Hunter, supra,* the court quoted from Chancellor Taylor in *Guerrant* v. *Fowler,* 1 Hen. & Munf. 4, that the court has jurisdiction to set aside and cancel a deed for fraud which has been executed for land lying in another State.  In *Johnson* v. *Gibson, supra,* the court, after quoting from *Massie* v. *Watts,* 6 Cranch, 148, said a decree in such case settles the rights of the parties and by attachment or other coercive means compels the offending party to comply with the decree, "or simply declares the transaction complained of void and thereby removes an obstruction to the enforcement of his legal remedies."

The statute is imperative that the suit to contest the will had to be commenced in Hancock county within one year after its admission to probate.  By far the greater part of the testator's property in which appellees claimed an interest was the land deeded at the time the will was made.  If

they were successful in setting aside the will alone, it would
not secure them any benefit in the McDonough and Hender-
son county land. It might or might not be possible to se-
cure an adjudication of a suit to set aside the deeds to the
land in McDonough and Henderson counties before the year
expired for filing the bill to contest the will. In this case
there was a small amount of property not conveyed, but if,
as not infrequently happens, the testator had conveyed all
his property, appellees would not have been "persons inter-
ested" and could not have maintained a bill to contest the
will without first securing a final adjudication that the deeds
were invalid. The deeds and will here involved were made
the same day and were practically contemporaneous acts of
the testator. The evidence to sustain or set them aside was
necessarily the same. We are of the opinion there is no
positive law or decision that the two objects cannot be com-
bined in one suit in the county where the statute requires
the suit to contest the will to be filed. The decree does not
"affect the land" but operates on the person and removes an
obstruction to the enforcement of appellees' rights. It is
not, and could not be, contended that if the land had been
in Hancock county the court could not have decreed the can-
cellation of the deeds. (*Stephens* v. *Collison,* 249 Ill. 225;
*McGovern* v. *McGovern,* 268 id. 135.) It was essential to
any right of appellees claimed in the bill in the land con-
veyed that both the will and deeds be set aside. It is true
they might, by beginning separate actions in the counties
where the lands were situate, have compelled appellants to
defend those suits in addition to the will contest, but the
evidence in each of the suits would have been substantially
the same. No rights of appellants were prejudiced by com-
bining the two objects in the bill. The decree made no or-
der affecting the land itself. The requirement of the law
that suits affecting land shall be brought in the county where
it or some part of it is situate was not violated by the de-
cree setting aside the deeds. In both cases last above cited

it was said that the procedure in a court of equity is elastic and adapted to the various circumstances of the case in order to do justice.

We are of opinion the decree setting aside the deeds was not void on the ground the court did not have jurisdiction of the subject matter.

On the question of undue influence there was additional evidence offered by appellees on the second trial. The bill charges that Mrs. James, Mrs. Huston, and her husband, Charles R. Huston, conspired to overcome what little remnant of intelligence the testator had left, and cause him, contrary to his wishes and desire, to devise to Mrs. James and Mrs. Huston a large part of his property and deprive appellees of any share therein which testator intended them to have, and induced him to go through the formalities of making the will; that it was not his free and voluntary act and would not have been made but for the wrongful conduct of said three persons; that Huston for a long space of time prior to the execution of the will had the control and management of testator's property and business; that testator trusted and relied on Huston in the control and management of his property and business, and that Huston occupied a fiduciary relation to the testator. The will was executed at the home of the Hustons, and besides the Welch brothers, who witnessed the will, Mrs. James and Mr. and Mrs. Huston were present. There was no direct proof as to who prepared the will. It was typewritten, and from that fact, and the further fact of testator's condition at the time, it is certain he did not prepare it himself. It was decided in our former decision that Huston sustained a fiduciary relation to the testator. The inference is warranted from the proof that the relations between appellants and appellees were not of a friendly character. Appellees visited their grandfather while he lived in LaHarpe, but after he went to the Huston home, in Blandinsville, they did not visit him any more, except that Lena Grigsby, one of ap-

pellees, visited him twice at Huston's during the summer.
Some time in July, 1918, appellees and Mrs. Mulloy filed a
petition in the county court for the appointment of a con-
servator for testator, which justifies the inference that they
were not satisfied to allow Huston to control and manage
the business and property. The petition never came to trial
but was dismissed by the petitioners. Mrs. Huston was
especially angry because of the filing of the petition. Two
witnesses, Mary Hankins and Harmenia Blackhurst, tes-
tified they lived near neighbors to the Hustons, and that
some time in July, 1918, while they were at their respect-
ive houses, their attention was attracted to the Huston home
by a scream, and Mary Hankins testified she heard Mrs.
Huston say, "Oh, pappy! I would never give them a dol-
lar!" She learned afterwards that was about the time, or
soon after, the summons was served in the conservator pro-
ceedings. Harmenia Blackhurst, the mother of appellees,
testified Mrs. Huston said, "They are so mean,—they are
so mean. Oh, pappy! I would never give them a dollar!"
Mary Hankins further testified that she saw Lena Grigsby,
one of appellees, go to Huston's house one Sunday after-
noon; that testator and Mrs. Huston were sitting in chairs
on the porch; that Mrs. Huston left her chair and went to
the other end of the porch; that Lena Grigsby sat in the
vacated chair by her grandfather; that he turned his back
to her; that after a little while Lena left; that Mrs. Hus-
ton then went to her father and said, "Oh, pappy! That
is the one that said you was crazy." Mrs. Myrna Huston,
daughter-in-law of the Hustons, testified for appellants that
she was at Huston's once, in August, when Lena Grigsby
visited her grandfather. They talked to each other and
seemed friendly. She stayed a half hour. Neither Mrs.
Huston, her husband or Mrs. James was there at that time.
This testimony has a bearing on the relations and attitude
of Mrs. Huston toward appellees. E. M. Phillips, who was
employed by Huston about the house in the summer of 1918,

testified Mrs. Huston said, in her father's presence, he was
not going to do very much for some of the heirs.

Appellees introduced in evidence a will executed by the
testator June 2, 1910, and three codicils, one made Octo-
ber 23, 1916, one March 20, 1917, and the third July 3,
1918. The original (1910) will gave testator's wife a life
estate in all his property, and subject to her estate he gave
his son Charles, father of appellees, who was then living,
260 acres of land, (100 acres in McDonough county and
160 acres in Henderson county,) to Mrs. James 240 acres,
to Mrs. Huston 240 acres and to Mrs.Mulloy 298 acres. To
his son William, father of Luella Blackhurst, who was then
living, he gave an annuity of $500. In the event of Wil-
liam's death before distribution, leaving his wife surviving,
she was to be paid $1000, but if both were dead the $1000
was to go to Luella. By another paragraph he gave Luella
$3000, to be paid her when she was eighteen years old. All
the remainder of the estate was devised to Charles, Mrs.
James, Mrs. Huston and Mrs. Mulloy, equally. Charles and
Mrs. Mulloy were named as executors without bond. Oc-
tober 19, 1916, testator made warranty deeds to Mrs. James,
Mrs. Huston and Mrs. Mulloy for the same land devised
them by his will. He also deeded Mrs. James and Mrs.
Huston an additional ten-acre tract. These deeds reserved
the rents and profits to the grantor during his life. His
wife had previously died. No deed was made to Charles,
but October 23, 1916, testator executed a codicil. The codi-
cil recited that Charles was dead, and Charles R. Huston
was appointed one of the executors in his place, to act with
Mrs. Mulloy. There was written on the margin of the codi-
cil, "The eraces maid in this codicil was maid before it was
sighned by the testator or the witnesses." March 20, 1917,
he made another codicil, in which he recited he had given
his son Charles certain land by his will; that Charles had
died since its execution and he devised the same land to
Charles' children, appellees. He further stated in the codi-

cil that he had advanced money to Charles during his life
and had allowed him to occupy part of the land devised to
him without the payment of rent, and he deemed it right
and proper that the children of Charles pay to Mrs. James,
Mrs. Huston, Mrs. Mulloy and Luella Blackhurst $5000
each within two years after his death, and the payment of
said sum to each of the persons named was made a charge
on the land devised appellees. He ratified and confirmed
in all other respects his will and the codicil thereto attached.
That codicil was witnessed by Lula M. Burr and Angeline
Hamilton. It did not, as first drawn, contain the name
of Luella Blackhurst, and the amount given to each of the
daughters and charged against the land was $7000. The
change was made by erasures and interlineations. On the
margin was written, "These changes were made before it
was signed." On July 3, 1918, testator made a third codi-
cil. By that codicil he revoked the residuary clause of the
will and devised all his residuary estate to Mrs. James and
Mrs. Huston. It will be remembered that the will of 1910
made the three daughters and Charles residuary legatees, to
share equally. He revoked the clause in the will appointing
Charles and Mrs. Mulloy executors and revoked the first
codicil. He named Mrs. James and Huston as executors,
without bond.

Mrs. Burr, one of the witnesses to the second codicil,
was a neighbor of the testator in LaHarpe. She testified
that shortly after his wife's death a daughter of Mrs. James
came for her to go to testator's house. When she arrived,
Mrs. James, Mrs. Huston and Mrs. Hamilton were there.
She was shown the second codicil and said she signed it
that day. Mrs. James said they needed testator's signature
to dispose of some money that had accumulated in the bank.
The testator was feeble and said nothing. He signed his
name. Mrs. James pulled his chair up close to the table
and told him she wanted him to write his name. She then
dipped the pen in the ink and placed his hand where he

signed. The writing on the margin was not there when witness signed the paper. Blackhurst was in a dazed condition. Angeline Hamilton testified Mrs. James came for her to go to testator's house and sign some papers. Mrs. James, her daughter and Mrs. Huston were present when she signed the paper. Mrs. Burr came after she arrived at the house. Witness recognized her signature but said she never read the paper. There was very little said at the · time. Blackhurst signed the paper with Mrs. James' help. She got the pen and ink, put the pen in his hand and directed his hand as he made the letters. He said nothing during the transaction. Both witnesses testified they did not consider him of sound mind.

The third codicil was executed while testator was at the Huston home, July 3, just one month before the last will was made. The words "made" and "signed" in the writing on the margin of the first codicil are spelled "maid" and "sighned." Dennis R. Burr, one of the witnesses to that codicil, testified Mrs. James, Mrs. Mulloy and Huston were present when it was signed. He was of the impression Mrs. Huston was present also but was not certain. He testified Blackhurst started to tell him what was in the paper, hesitated, and said to Huston, "You tell him; you can explain it better than I can," and Huston did tell him the purpose of the paper.

Mrs. James made the erasures in and the memorandum on the margin of the second codicil. Appellees proved the memorandum on the margin of the first codicil, "The eraces maid in this codicil was maid before it was sighned by the testator or the witnesses," was in the handwriting of Huston. Appellees proved that there was a typewriting machine in the bank of which Huston was cashier and that he frequently used it; that he usually spelled made "maid," and sign or signed "sighn" or "sighned." Those words were spelled as Huston usually spelled them, in the memorandum he wrote on the margin of the first codicil. The will now

being contested was typewritten. The word "signed" occurred twice and the word "signing" once in the attestation clause. Both times the word "signed" was spelled "sighned" and "signing" was spelled "sighning." As we have said, no one testified directly who wrote the last will. It is certain the testator did not. Someone else prepared it, and the circumstances proved tend to show Huston did it. He procured the witnesses to attest it and the notary public to go to the house to take the acknowledgment to the deeds. His wife and Mrs. James were present when it was executed. Charles L. Welch, one of the witnesses to the last will, testified that when he went into the room where testator was, the will was lying on a table. Testator said he wanted them to witness the will and asked witness' brother to read it. He read it to testator, who made some remark about it being the way he wanted it, and it was then signed. The testator's signature was written by M. B. Welch, and he then made his mark. M. B. Welch, the other witness to the will, testified he read the will to testator at his request and he expressed satisfaction with it.

Appellants objected to the admission in evidence of the will of June, 1910, and the codicils, and now insist the court erred in admitting them. *O'Day* v. *Crabb,* 269 Ill. 123, is relied on to support that contention. That case holds a prior inconsistent will is not competent evidence on behalf of contestants in a will contest suit, but that a prior will making a disposition of property substantially like the one being contested is competent on behalf of proponents "in order to show that the testator had a constant and enduring scheme for the distribution of his property, and thus refute the charge of lack of testamentary capacity or undue influence." That is undoubtedly correct as a general rule, but we are of opinion it cannot be applied in this case. The amended and supplemental bill alleged the Hustons and Mrs. James conspired to procure the execution of the will and deeds of August 3, 1918, and proof including the will of

1910 and codicils and the circumstances surrounding or attending the execution of the codicils, as well as the last will and deeds and the acts and relationship of the parties, were competent as tending to support the allegations of the bill. The mere fact that a testator had by a prior will made a different disposition of his property from that made by a later will, of itself would be of little or no value, for he would, if mentally competent to make a will, have a right to change his mind so long as his testamentary capacity continued. The acts of the testator subsequent to making the first will, his physical and mental condition when those acts occurred, and the circumstances surrounding him when those acts were performed, are unquestionably competent as tending to sustain the allegations of the bill that appellants conspired to cause the testator to make a distribution of his property more beneficial to their interest. (*Ochs* v. *People,* 124 Ill. 399; *Spies* v. *People,* 122 id. 1; *Davidson* v. *United States,* 274 Fed. 285.) That proof in the record cannot be read without producing in the mind a strong suspicion, at least, that appellants from 1916 till testator's death had, in the language of *O'Day* v. *Crabb,* "an enduring scheme" for the distribution of testator's property. During that period of time he was physically and mentally weak. Every act, after making the first will, the testator performed relating to the disposition of his property was unfavorable to the interests of appellees and favorable to appellants until the final act, the will of August 3, 1918, by which appellees were completely disinherited and appellants' share in his estate was greatly increased.

Undue influence may be proved by circumstances, and the feebler the mind the less evidence will be required. (*England* v. *Fawbush,* 204 Ill. 384; *Gum* v. *Reep,* 275 id. 503.) The influence of affection or partiality for a child, coupled with persuasion, is not wrongful in a legal sense of the term, but would be if it went to the extent of depriving the testator of his free agency. It is well settled and gen-

erally understood that undue influence which will invalidate a will must be influence specially directed to procuring the will favoring particular parties, must be operative at the time of the transaction, and the will must be made as the result of such influence and not the free will of the testator. The proof objected to was competent as tending to show undue influence. Its weight and value on that issue, considered in connection with other evidence, were questions for the jury.

Without further extending the discussion of the subject, we hold admitting the will of 1910 and codicils was not erroneous. The fact that Luella Blackhurst was not connected with the alleged conspiracy can make no difference in our ruling. Charles R. Huston sustained a fiduciary relation to the testator. The circumstances proved tend to show he prepared the will. His wife was one of the principal beneficiaries and he was named as one of the executors. On account of the testator's physical and mental condition and the existence of a fiduciary relation between Huston and testator, the presumption of undue influence is rendered much stronger unless overcome by evidence rebutting it. *Berry* v. *Egan,* 291 Ill. 377; *Thomas* v. *Whitney,* 186 id. 225.

The fifth paragraph of the will stated that testator's reason for disinheriting appellees was that they and Mrs. Mulloy had for a period of time last past tormented and annoyed him about the management of his property and had recently filed a petition asking for the appointment of a conservator to take charge and management of the property; that they charged in the petition he was incapable of managing and caring for his property, "which charges are altogether false and untrue," and had treated him unjustly and unfairly. We think no special importance can be attached to that clause of the will in view of all the testimony. The only evidence that appellees had ever tormented or annoyed him about the management of his property was the

filing of the petition for the appointment of a conservator. He himself more than once admitted, and· the evidence shows, he was not capable of looking after and managing his property, and that he entrusted its management to his son-in-law, Huston. When he made the second codicil to the will of 1910 and charged the land devised appellees with the payment of $5000 to each of his three daughters and to Luella Blackhurst, the codicil said his reason for doing that was because he had advanced his son Charles certain sums of money and had permitted him to use part of the land devised without the payment of rent a number of years. It nowhere else appears from the record that he had ever advanced Charles any money. By a paper signed by testator, together with his three daughters and appellees, dated March 20, 1917, and filed in the county court March 24, he released his life interest in $12,000 cash in the hands of his wife's executor for immediate distribution to his daughters and appellees. Before testator went to Huston's, in March, 1918, the relations between him and appellees appear to have been friendly. They visited him at his home in LaHarpe, but, except Lena Grigsby, they did not visit him at the Huston home in Blandinsville. When Lena Grigsby visited her grandfather in the absence of the Hustons he talked with her and treated her in a friendly manner, but she received no such treatment when she visited him in the presence of Mrs. Huston.

The points we have above discussed are the principal points of contention between the parties. Some other objections are made to the rulings of the court in admission of testimony for appellees. They are of minor importance, and even if it be true (which we do not admit) that some of appellants' objections to the testimony were well taken, none of it was, in our judgment, of so material a nature as to justify a reversal of the decree.

The decree is affirmed.                    *Decree affirmed.*

Mr. JUSTICE STONE, dissenting.