(No. 25221.—

ALBERTINA SULZBERGER *et al.* Appellees, *vs.* BERTRAM L. SULZBERGER *et al.* Appellants.

*Opinion filed October 13, 1939.*

PAINTER & HAYES, and C. B. CHAPMAN, guardian *ad litem,* for appellants.

BUTTERS & BERRY, and HIBBS & POOL, for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Reno Sulzberger, a bachelor aged forty-eight, died on May 17, 1936. His will, which was executed three days before his death, was duly admitted to record in the probate court of LaSalle county on June 25, 1936. He bequeathed $50 to his brother Harry; $50 to the children of his deceased brother Edward, living at his death, to be divided equally among them; $50 to the children of his deceased brother William, and $50 to the children of his deceased brother Eugene. He devised to Albert J., an older brother, a life estate in an undivided one-third interest in all of his real estate, subject to a mortgage indebtedness, with remainder to his brother Bertram L., if he should be living at that time, and if not, then to Bertram's children living at his death. A similar devise of a life estate in an undivided one-third of his land was made to his older sister, Albertina. The remainder was devised to Bertram or his children as in the case of the devise to Albert J. He devised the remaining undivided one-third in fee to Bertram subject to the mortgage indebtedness. All the residue of his personal property he bequeathed to Albert J., Albertina, and Bertram in equal parts. He nominated Bertram as executor without bond. Bertram, his children, and a minor

son of a deceased brother of the testator were made defendants in a complaint filed by the other heirs to set aside the will and the probate thereof. They charged want of mental capacity on the part of the testator and undue influence on the part of Bertram. Issues were made up and submitted to a jury, and a verdict was returned that the instrument was not the last will and testament of Reno Sulzberger. A decree was rendered setting aside the will and the probate thereof, and the defendants have appealed.

Reno Sulzberger was forty-eight years old at the time of his death, and it is admitted that he had testamentary capacity up to the time he went to St. Mary's Hospital, in Streator, on May 9, 1936, where he died after eight days' illness from complications attendant upon Bright's disease. The testator lived on the old home farm near the village of Ransom. He and Bertram had lived together for a number of years, until Bertram married and moved to an adjoining farm, but they continued to exchange work, and Bertram's sons worked for the testator. On May 7, 1936, while Reno was helping Bertram shell corn, he became ill and went to see Dr. Thomas E. Ryan, at Ransom. An examination revealed that he was suffering from an acute infection in the abdomen and intestines and had a temperature of 104 degrees. The doctor prescribed medicine, rest and a liquid diet, but on the next day his temperature was still high and his pulse was rapid. Fearful that he was developing complications, the doctor gave him an injection of morphine and sent him to the hospital at Streator. On May 10, he diagnosed Reno's condition as a complication of toxic nephritis or Bright's disease. There was a toxic condition in the blood stream which produced drowsiness or stupor. Part of the time the patient was irrational and restless and at times he was in a stupor. Dr. Ryan testified that a toxic condition of the blood stream tends to weaken the mental and physical faculties. The hospital records are in evidence, and the temperature chart shows that the testator's

temperature reached 104 degrees on every day between May 9, when he entered the hospital, and May 15, and on the following two days it ranged between 102 and 103 degrees. At the time he signed the will, it was 103 degrees. The clinical reports of the hospital, as explained by Dr. Ryan, show the treatment given the patient. The treatment was designed to build up his system so that he could eliminate the poisons in the blood stream caused by failure of the kidneys to function. Accordingly 1000 c.c. of glucose solution were injected under the skin every twelve hours. Digifoline, a heart stimulant, was administered at intervals. Enemas were given twice daily to help relieve the distension of the abdomen. Morphine was given to relieve pain, but none had been given to him for more than twelve hours before the will was signed, and, according to Dr. Ryan, its effects would be gone in twelve hours. Cloths saturated with a solution of turpentine and hot water were kept on his abdomen under an electric pad, and ice packs were used to relieve the severe headaches he suffered. The ice pack was renewed shortly before the will was signed. On one occasion to minimize the toxic condition a pint of blood was drawn.

It is admitted that testator was seriously ill at the time he executed the will, but the evidence is highly conflicting as to his mental condition. Bertram went to an attorney's office in Streator and had the will prepared. The attorney, who represents Bertram as executor under the will, but who withdrew from this case and testified, says that he drew the will according to instructions which Bertram said he received from the testator. Whether Bertram was told to prepare the will by the testator, or was the moving party in having it prepared, is sharply disputed. The attorney testified that he asked the testator if the will was like he had ordered it, and he said that it was. It is undenied that Bertram also procured the witnesses to the will. On the other hand, there is testimony which would indicate that tes-

tator was not able to talk enough to give directions as to how he wanted his will drawn and that he displayed no interest in his surroundings. He joined the Methodist church on the night before he was supposed to have executed his will. All he could say to the minister was "Church," and from this the latter was able to guess that he wanted to join the church. The minister then asked questions requiring only yes and no answers. The special nurse who was on full-time duty testified that she was of the opinion that testator was of sound mind and memory. However, she admitted that she did not take her customary four-hours' rest on Thursday, the day the will was supposed to have been executed, because of the serious condition of her patient. This witness said that Bertram asked her early Thursday morning if she thought Reno could make a will. A regular nurse employed by the hospital was of the opinion that testator was irrational most of the time he was there. All those present at the execution of the instrument, including the lawyer, the two attesting witnesses and the special nurse, were of the opinion the testator was mentally competent to make a will. The lawyer said that before the witnesses came he read the will to the testator clause by clause, and that testator then asked for a pen and paper so that he could practice writing his name lying down. Later the lawyer held the will in front of testator on a magazine, and he signed it while the attesting witnesses looked on. Bertram was in the waiting room of the hospital, while this was going on. The lawyer went to the hospital at 11 :00 o'clock on Thursday morning, but was told that he could not see the testator, and so he had returned in the afternoon about 1 :00 o'clock. There is no explanation as to why he was unable to see testator on the first visit.

Appellants contend the verdict was the result of passion and prejudice and was against the manifest weight of the evidence. Counsel for both sides have argued the question of the sufficiency of the evidence to sustain the verdict, but

no useful purpose would be served by setting forth the testimony in more detail. There is no doubt that the evidence on either side, standing alone, is sufficient to sustain a verdict for that side. The conclusion as to the competency of the testator and the undue influence of Bertram depends not alone on the number of witnesses, but upon the weight to be given their testimony. This depends upon their opportunities for observation and the formation of an opinion, their intelligence, apparent honesty, and interest, their relation to the parties, and the circumstances appearing on the trial which might affect their credibility. These are questions which the jury and trial judge were in a much better position to determine than we are. Where the evidence in favor of the prevailing party, standing alone, is sufficient to sustain the verdict, the judgment will not be reversed unless the verdict is contrary to the manifest weight of the evidence.

Appellants contend there was no evidence of undue influence and that the court erred in giving instructions based on that theory. While they filed motions for findings in their favor at the close of the contestants' evidence and at the close of all the evidence, they did not ask that the issue of undue influence be taken from the jury. However, there was sufficient evidence to go to the jury on that issue. The rule stated in *England* v. *Fawbush,* 204 Ill. 384, 392, and since quoted and followed in numerous cases is: "Where a will is written, or procured to be written, by a person largely benefited by it, such circumstance excites stricter scrutiny and requires stricter proof of volition and capacity. The proof, required in such cases, must be such as to fully satisfy the court or jury that the testator was not imposed upon, but knew what he was doing, and what disposition he was making of his property when he made his will. The active agency of the beneficiary of a will in procuring it to be drawn, especially in the absence of those who have at least equal claims upon the justice of the testator, and

where the testator is enfeebled by old age and disease, is a circumstance which indicates the probable exercise of undue influence. Where the mind is wearied and debilitated by long-continued and serious and painful sickness, it is susceptible to undue influence and is liable to be imposed upon by fraud and misrepresentation. 'The feebler the mind of the testator, no matter from what cause,—whether from sickness or otherwise,—the less evidence will be required to invalidate the will of such person.' " See, also, *Blackhurst* v. *James,* 304 Ill. 586; *Donnan* v. *Donnan,* 256 id. 244; *Cheney* v. *Goldy,* 225 id. 394. Appellants seek to distinguish these cases on the facts. The cases do involve different fact situations, and some of them involve fiduciary relationships, but through them all runs the principle that one who benefits largely from a will made through his agency, in the absence of others having equal claim to the testator's bounty, is faced with a presumption that he exercised undue influence, and the strength of the presumption depends upon the condition of the testator's mind when he made the will. In the case at bar, the jury could reasonably believe that the testator was unable to give directions as to making his will, and if it did, it could not believe the testimony that the will was made according to directions given to Bertram. It would not be essential for Bertram to be present when the will was actually signed. It would be enough if the instrument were obtained at his instigation.

Complaint is made of the giving of contestants' instructions Nos. 5, 6, 7, 8, 9, 10 and 13. We need not lengthen this opinion by a detailed consideration of them. The objection to Nos. 5, 6 and 7, which deal with undue influence, is that they are not based on any evidence in the record. This point is not well taken, because we have already held there was sufficient evidence to require that question to be submitted to the jury. Appellants also say that most of these instructions unduly single out facts, such

as the inequality of distribution made by the will. Taken as a series, as instructions must be, they are not subject to this criticism. Instruction No. 13 embodies the law as set forth in our earlier quotation from *England* v. *Fawbush, supra,* and was properly given. It is contended that in none of the instructions given on behalf of contestants, was the jury told that the undue influence which will avoid a will must be directly connected with the execution of the instrument and be operating when the will is made. The fifth given instruction so informed the jury, and so this contention must be overruled. The jury was adequately and properly instructed and there was no error in that regard.

The decree of the circuit court of LaSalle county is correct, and it is affirmed.  *Decree affirmed.*