Clifton L. Swenson, Plaintiff-Appellee, v. Ila D. Wintercorn, Individually, Ila D. Wintercorn, as Executor of a Certain Instrument Purporting To Be the Last Will and Testament of Mabel M. Banta, Deceased, and Ila D. Wintercorn, Trustee of a Certain Purported Trust, Designated as Banta Trust No. 101, Dated September 15, 1959, Defendants-Appellants, and Kenneth Revell, et al., Defendants.

Gen. No. 67–100.

Second District.

February 9, 1968.

Maynard, Maynard and Brassfield, of Rockford, for appellants.

Guyer and Enichen, of Rockford, for appellee.

MR. PRESIDING JUSTICE DAVIS delivered the opinion of the court.

This action was brought to contest the validity of the last will and of a trust agreement, both executed by Mabel M. Banta (hereinafter referred to as Mrs. Banta) on September 15, 1959. In answer to special interrogatories, the jury found that on that date, Mrs. Banta possessed sufficient mental capacity to execute the instruments in question. However, it also found that the execution of these instruments was procured through undue influence. The defendant, Ila D. Wintercorn (hereinafter referred to as Ila Green), appealed from the judgment based upon the last mentioned special finding, which judgment declared the instruments null and void.

The evidence was conflicting, and it would unduly lengthen this opinion to set forth in detail the testimony elicited from the various witnesses. We will sufficiently summarize it for an understanding of the factual matters presented to the jury and court below.

The plaintiff, Clifton L. Swenson, and the defendant, Ila Green, are a nephew and niece of the decedent, Mrs. Banta, who died in July of 1964 at the age of 78. She originally lived in Rockford, then moved to Chicago, where she married and lived the major portion of her life with her husband, Frank Banta. No children were born of the marriage. Frank Banta died in 1956. There is some conflict in the evidence relative to the impact of

Mr. Banta's death on Mrs. Banta's mental processes subsequent to his death.

Two of her closest friends, Mrs. Lamey and Mrs. Johnson, testified that in the several years subsequent to her husband's death there was no change in her mannerisms or mental capabilities. Mrs. Nims of Rockford, who had visited Mrs. Banta in Chicago at least once during this period of time, testified that Mrs. Banta appeared to suffer only the normal grief to be expected, but that there was some question as to whether she was then as well-groomed as she had been prior to her husband's death.

Jean Westberg, a sister-in-law of Mrs. Banta, who lived in Rockford, testified that she had visited Mrs. Banta in Chicago, on several occasions, between the date of Mr. Banta's death in 1956 and the fall of 1959, when Mrs. Banta moved to Rockford, and that Mrs. Banta's conduct was different in the following respects after her husband's death: that Mrs. Banta was forgetful, would keep repeating herself, and would ask the same questions over time and again; that she would make a trip to the bank and shortly thereafter forget the fact that such trip had been made; that prior to his death, she was neat and tidy, but thereafter she was unkempt, her apartment was dirty and in disorder.

In February of 1957—the period of time in question—William Lamey (the son of one of Mrs. Banta's good friends, and a Chicago attorney) prepared a will for Mrs. Banta, which she duly executed. It was his testimony that she was completely competent at that time.

Mr. George Doelle testified on behalf of the plaintiff. He stated that he had known Mrs. Banta since about 1934; that he was her financial advisor; that he sold her annuities, and bought and sold securities for her; that he saw her perhaps twice each year, and noticed no change in her until the year 1959. Upon his return from Florida in April of 1959, he learned that Mrs. Banta had called

him by telephone a number of times. When he talked with her, she stated that she could not find her annuity checks. Mrs. Banta was then receiving four or five such checks each month. Mr. Doelle was certain that the checks had come in and convinced her to wait for a week or so before trying to get duplicate checks. About a week later, Mrs. Banta called saying that she had found the checks. He testified that thereafter the same thing happened every month. She would call stating that she had not received her checks and that she thought the company must be going broke. Mr. Doelle would assure her that this was not true and Mrs. Banta would then state that the mailman must be stealing the checks.

On one occasion Mr. Doelle had the insurance company issue duplicate checks. Later the original checks turned up—endorsed by Mrs. Banta. When confronted with these, she said she couldn't believe it. He further testified that Mrs. Banta would call at 9:00 a. m., then would call again, perhaps an hour later, forgetting that she had made the prior call; that sometimes this would happen three or four times a day—Mrs. Banta forgetting each of the earlier telephone calls; and that all of this started in April of 1959, and got progressively worse.

He was then concerned about Mrs. Banta's condition and called several of her friends in Chicago. In August of 1959, he called the defendant, Ila Green, in Rockford, and told her about Mrs. Banta's condition and informed her that the company would have to send the checks to a bank or to someone who could keep track of them and see that they were properly endorsed. He and Ila Green also discussed the possibility of Mrs. Banta moving to Rockford. He also listed the annuity numbers with her and apparently arranged to have the checks sent to her address.

Late in August of 1959, Ila Green and her husband helped Mrs. Banta close her apartment in Chicago and move, temporarily, to the Green home in Rockford, and it was during the time she was living in the Green home

94

that the transactions in question took place. On August 29, Mrs. Banta rented a safe-deposit box in the name of herself and Ila Green; on August 31, 1959, a checking account was opened in the name of Mrs. Banta and Ila Green, jointly, with an initial deposit of $1,500 which was taken from Mrs. Banta's personal account in Chicago; and on September 4, 1959, a similar joint savings account was opened with an initial deposit of $3,000.

The employee of the Rockford bank who opened these accounts had known Mrs. Banta for a number of years. Her testimony, relative to the conversations at the time the accounts were opened, indicated that she felt that Mrs. Banta was fully aware of the nature of her transactions and fully competent.

Ila Green and her husband were both clients of attorney Frank Welsh of Rockford. Mr. Welsh testified that shortly before September 9, he received a telephone call— which to the best of his memory was from Mr. Green— stating that Mrs. Banta was coming to Rockford and should have someone locally look after her affairs. As a result of this telephone call, or a subsequent telephone call from Mrs. Banta, Mr. Welsh and his secretary went to the home of the Greens on September 9. They were met at the door by Ila Green, who introduced them to Mrs. Banta. Ila Green then removed herself to some other part of the house, and Mr. Welsh, his secretary, Mr. Green and Mrs. Banta retired to the living room where they discussed Mrs. Banta's estate problems and proposed plans.

This discussion lasted about an hour or an hour and a half. Mr. Green, apparently, did not say much at this meeting. Mr. Welsh remembered that Mr. Green had talked to Mrs. Banta about her will or estate and urged her "she should get at it," but he could not recall whether such remark was made at this meeting or on some other occasion.

Mr. Welsh testified that at the meeting at the Green home, Mrs. Banta made known that it was her wish that $2,500 of her estate should go to a certain nephew (the plaintiff), $2,500 to a niece, and the balance to Ila Green —because the Greens had been good to her and had helped her over the years. She then presented to Mr. Welsh certain annuity policies and her 1957 will. Mr. Welsh recommended that Mrs. Banta execute a revocable trust containing the provisions which she allegedly specified and a will pouring over any residuary estate into this trust.

Shortly prior to this, on September 4, Ila Green had taken Mrs. Banta to a doctor for a physical examination. The doctor testified that his examination disclosed no essential physical defects. But, he also testified that on September 8—the day before Attorney Welsh and his secretary met with Mrs. Banta and Mr. Green at the Green home—he had a telephone conversation with Ila Green, who stated that she though her aunt's mind was deteriorating rather rapidly to the point where she could not seem to remember much of anything; that for months Mrs. Banta had not been able to conduct her own business; that her check writing was mixed up; and that she seemed preoccupied or simply unable to conduct her own affairs.

On September 11, Mr. Green brought Mrs. Banta to Mr. Welsh's office and from there they went to the safety-deposit box, where an inventory was made of its items.

On September 15, the Greens brought Mrs. Banta to Mr. Welsh's office where the trust agreement, will and other documents were executed. This meeting lasted about an hour and a half—the Greens being present the entire time.

In the trust agreement, Mrs. Banta designated herself and Ila Green as trustees, retained the right to revoke or

modify the agreement in any manner, and provided that upon her death the balance remaining, after payment of certain taxes, debts and obligations, should be distributed in the following manner: $2,500 to Lucille Peterson, a niece, if she should survive Mrs. Banta, and if not, said sum should go to her children; $2,500 to Clifton Swenson, a nephew, if he should survive Mrs. Banta, and if not, this sum should then be added to the share provided for Ila Green; and the balance to Ila Green. Mr. Green was named as successor trustee should either of the trustees be unable to act. The assets of the trust had an approximate value as of that date of $80,000. On the date of her death, for inheritance tax purposes, Mrs. Banta's estate was valued at $98,000.

The will poured all the residue of Mrs. Banta's estate over into the trust. Ila Green was nominated as executor and Mr. Green as successor executor.

In her 1957 will, Mrs. Banta had provided that Ila Green was to receive one-half and Lucille Peterson and Clifton Swenson each were to receive one-fourth of the estate, and that if any of the designated beneficiaries should predecease her, such person's share would pass to his or her children then surviving. Lastly, it provided that if the respective designated beneficiaries did not survive and had no children surviving, then such share would go to the other named surviving beneficiaries equally, except in the case of Clifton Swenson. In his case, if he predeceased Mrs. Banta and left no children surviving, his share would go to his wife if she survived Mrs. Banta. Ila Green had also been appointed as executor under this will and Mr. Lamey as successor executor.

Subsequently, on October 1, 1959, Mrs. Banta was moved from the Green home to a certain apartment in Rockford, where she lived for about a year. There was a great deal of testimony relative to her mental condition during this period of time from both the witnesses here-

tofore mentioned and additional witnesses. This testimony, like that relative to her mental capacity prior to the time she moved to Rockford, was conflicting. Certain witnesses stated that Mrs. Banta was extremely forgetful, uncertain, untidy and lacking in mental capacity, while others said that she was perfectly lucid and competent during this period of time.

Mrs. Banta moved from the apartment to a nursing home where she stayed for a short period of time. From there, she went to live with another relative, Florence Westberg, where she lived for three years. She left there to go to the state institution at Moline where she remained for a few months, and was then moved to another nursing home in Rockford where she stayed until her death in 1964.

The defendant contends that the trial court erred in refusing defendant's motions for a directed verdict on the issue of undue influence; that the trial court should have granted her motion for judgment notwithstanding the verdict on the issue of undue influence; that the special verdict regarding undue influence was contrary to the manifest weight of the evidence; that the court erred in instructing the jury; and that counsel for the plaintiff was guilty of improper remarks in his closing argument.

The plaintiff did not cross appeal from the special finding of the jury that Mrs. Banta was of sound mind and memory at the time of the execution of the documents in question, and that determination is not before this court. People ex rel. Southfield Co. v. Jarecki, 408 Ill 266, 271–276, incl., 96 NE2d 569 (1951) ; Robbins v. Campbell, 65 Ill App2d 478, 485, 486, 213 NE2d 641 (1965); Bawden v. Furlong, 16 Ill App2d 174, 185, 147 NE2d 889 (1958).

While this is a special statutory proceeding, the defendant's motions for a directed verdict and for

judgment notwithstanding the verdict are governed by the same rules which apply in actions at law. Peters v. Catt, 15 Ill2d 255, 259, 154 NE2d 280 (1958); Mitchell v. Van Scoyk, 1 Ill2d 160, 167, 115 NE2d 226 (1953). Whether the trial court was correct in refusing to grant the directed verdict for defendant or defendant's motion for judgment notwithstanding the verdict depends on whether all of the evidence when viewed in its aspect most favorable to the plaintiff, so overwhelmingly favors the defendant that no contrary verdict based on that evidence could ever stand. Pedrick v. Peoria & E. R. Co., 37 Ill2d 494, 510, 229 NE2d 504 (1967).

 The undue influence which will invalidate a will and instrument such as are before this court must be directly connected with the procurement and execution of these instruments and must be operative at the time they are made. Peters v. Catt, supra, 263; Ginsberg v. Ginsberg, 361 Ill 499, 510, 198 NE 432 (1935). The influence must be specifically directed towards procuring the will in favor of a particular party or parties and must be such as to destroy the testator's will and render the instruments more the will of another or others than that of the person executing the documents. Redmond v. Steele, 5 Ill2d 602, 609, 610, 126 NE2d 619 (1955); Lake v. Seiffert, 410 Ill 444, 448, 102 NE2d 294 (1951).

 Under certain circumstances, a presumption will arise that the instrument is the result of undue influence. One such circumstance is: where a fiduciary relationship exists between the testator and a devisee or legatee who receives a substantial benefit from the will; where the testator is the dependent and the devisee or legatee the dominant party; where the testator reposes trust and confidence in the devisee, or legatee, and where the will is prepared by or its preparation procured by such devisee or legatee. Proof of these facts will establish a prima facie case that the execution of the will was the

result of undue influence. Redmond v. Steele, supra, 610; Tidholm v. Tidholm, 391 Ill 19, 25, 54 NE2d 745 (1945); Malone v. Malone, 26 Ill App2d 291, 303, 304, 167 NE2d 703 (1960).

As to the fiduciary relationship, such a relationship exists where there is a special confidence reposed in one, who by reason of such confidence, must act in good conscience and good faith and with due regard to the interests of the person reposing such confidence. It may exist as a matter of law between attorney-client, guardian-ward, trustee-beneficiary, and the like, or it may be the result of a more informal relationship—moral, social, domestic or even personal in its origin. Kolze v. Fordtran, 412 Ill 461, 468, 107 NE2d 686 (1952); Wiik v. Hagen, 410 Ill 158, 163, 101 NE2d 585 (1951). Where the relationship does not exist as a matter of law, the proof must be clear, convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion. Kolze v. Fordtran, supra; Scherman v. Scherman, 395 Ill 574, 578, 71 NE2d 16 (1947).

It must be specifically noted that even though a fiduciary relationship may exist, the dominant party also must have been instrumental in procuring the execution of the will, or participated in its preparation and execution for the presumption of undue influence to arise. The presumption of undue influence arises from participating in procuring the execution of the will and not from the mere fact of the fiduciary relationship. Anthony v. Anthony, 20 Ill2d 584, 587, 170 NE2d 603 (1960); Greathouse v. Vosburgh, 19 Ill2d 555, 573, 169 NE2d 97 (1960).

It seems fairly obvious to this court that at the time in question Mrs. Banta reposed special confidence in Ila Green and her husband. To a certain extent this is admitted by the defendant in her answer wherein she states, "She admits that the decedent, Mabel M. Banta, did to a

limited extent confide in and depend upon Ila D. Wintercorn to assist her in transacting her affairs."

Ila Green and her husband had moved Mrs. Banta from her Chicago apartment to their residence in Rockford in order to assist her. Mrs. Banta immediately placed all of her accounts—as well as her safety deposit box—in her name and Ila Green's name, jointly. There was sufficient evidence to permit the conclusion that Mrs. Banta was, at this time, somewhat disoriented. Ila Green arranged an appointment with Dr. Hamlin for a physical examination for Mrs. Banta. The confidence in Ila Green was not a sudden or recent thing. In her earlier will of 1957, Mrs. Banta made Ila Green a devisee and legatee and named her as executor.

It is also apparent that Mrs. Banta relied upon Ila Green and her husband to see that her estate matters were taken care of. We do not know who was the moving force, but we think this is unimportant. The Greens were instrumental in procuring the services of their own attorney. It appears that Mr. Green urged Mrs. Banta to see that the matters of her estate were taken care of, and he was with her during all of the discussions regarding her will and estate; and both Ila Green and her husband were present during the time the trust instruments and the will, as finally prepared, were explained and executed by Mrs. Banta.

■■■ There is adequate evidence to establish the existence of a fiduciary relationship, the dependent and the dominant roles, and the procurement of the preparation and execution of these instruments. The instruments disclosed that Ila Green was to receive a substantial benefit from their execution. These factors are sufficient to establish a prima facie case of undue influence.

■■■ ■■■ Even absent the existence of a fiduciary relationship, the factors in this case are sufficient to create a presumption of undue influence. One who procures the

101

execution of a will largely benefiting him, in the absence of others having an equal claim on the bounty of a testator who is enfeebled by age and disease, is faced with the presumption that he exercised undue influence. Mitchell v. Van Scoyk, supra, 172; Sulzberger v. Sulzberger, 372 Ill 240, 245, 246, 23 NE2d 46 (1939). The strength of this presumption depends upon the condition of the testator's mind when the will was made. Mitchell v. Van Scoyk, supra. It is for this reason that we have herein referred to the testimony regarding Mrs. Banta's mental condition. No objection has been raised to the finding of the jury on the issue of mental capacity. The evidence, however, remains relevant as to the issue of undue influence. The feebler the mind of the testator, the less evidence will be required to establish the existence of undue influence. Mitchell v. Van Scoyk, supra; Lake v. Seiffert, supra, 449; Gum v. Reep, 275 Ill 503, 513, 114 NE 271 (1916).

██ Whether the undue influence may have been practiced by Ila Green alone, or by her husband for the benefit of Ila Green, or by both of them for the benefit of Ila Green, is immaterial. Undue influence may be the result of activities of third persons as well as a result of activities of the direct beneficiaries. Blackhurst v. James, 304 Ill 586, 604, 136 NE 754 (1922); Cheney v. Goldy, 225 Ill 394, 400, 80 NE 289 (1907). The determining factor is whether the influence is directed towards procuring the will in favor of a particular party or parties, and whether the influence was sufficiently great that the resulting instrument was more the will of the procurer than of the person executing the instrument. Insofar as Mr. Green may have been instrumental in influencing Mrs. Banta to favor his wife, his activity may be imputed to his wife. In re Trefren's Estate, 86 Cal App2d 139, 194 P2d 574, 579.

Under the test outlined in Pedrick, supra, we are of the opinion that it would have been error for the trial

court to direct a verdict for the defendant on the issue of undue influence or to render a judgment for the defendant on this issue notwithstanding the verdict. Under the law applicable to this case and viewing the evidence in its aspect most favorable to plaintiff, we cannot say that a verdict based upon this evidence so overwhelmingly favors the defendant that a contrary verdict cannot stand.

Nor, are we able to say that the verdict was palpably contrary to the weight of the evidence. The jury would have been warranted in finding, from the testimony of Mr. Doelle and others, that at the time in question, Mrs. Banta was a confused person even if she possessed sufficient capacity to execute the instruments in question. It appears from the telephone conversation between Ila Green and the doctor on September 8, that Ila Green shared the same concern. She and her husband were sufficiently concerned to remove Mrs. Banta from her Chicago apartment to their home to spend approximately a month with them.

The manner in which her financial affairs were immediately set up upon her arrival in Rockford would indicate that Mrs. Banta relied upon Ila Green for assistance and direction and that she also reposed confidence in her. The jury could well have concluded that Ila Green and her husband actively, and with dispatch, procured the execution of the documents necessary to place Mrs. Banta's estate in order. The resulting documents clearly benefited Ila Green and substantially increased her share in Mrs. Banta's estate over the share she would have received under the will executed by Mrs. Banta in 1957.

We have reviewed the entire record and find that the jury, dependent upon the credibility which it accorded to the testimony of the witnesses of the parties, might well have decided the case either way. However, both the jury, and the judge who ruled on the post-trial motion, heard the evidence, saw the witnesses and had an oc-

103

casion to take into account their ability and opportunity to observe the facts testified to, their memory, manner while testifying, any interest, bias or prejudice which they may have had, and the reasonableness of their testimony when considered in the light of all the evidence in the case. This is not a case in which an opposite conclusion to that of the jury is clearly evident, as is required before we can disturb the verdict. Lilegdon v. Hanuska, 85 Ill App2d 262, 271, 229 NE2d 314 (1967). There is ample evidence to sustain the verdict of the jury and it would be improper for us to reverse the judgment on this ground.

The defendant also contends that the trial court erred in refusing to give the following instruction:

"The Court instructs the jury that any degree of influence over another acquired by kindness and attention, can never constitute undue influence within the meaning of the law, and although the jury may believe from the evidence that the decedent, Mabel M. Banta, in making her Will and Trust was influenced by the defendant, Ila D. Wintercorn, still if the jury further believe from the evidence that the influence which was so exerted was only such as was gained over the deceased by kindness and friendly attention to her, then such influence cannot be regarded in law as undue influence."

The defendant is correct in her contention that influence resulting from affection, kindness and friendliness does not constitute undue influence. Lake v. Seiffert, supra, 450; Waters v. Waters, 222 Ill 26, 36, 78 NE 1 (1906). The evil in the tendered instruction is that it advised the jury that "*any* degree of influence over another acquired by kindness and attention, can *never* constitute undue influence within the meaning of the law," and that even if the jury believed that the defendant in-

104

fluenced Mrs. Banta in making her will, if it further believed that such influence was gained only by kindness and friendly attention, "then such influence *cannot* be regarded in law as undue influence."

 The normal influence gained or acquired by affection or kindness is not undue influence under the law. If, however, the degree of influence so-acquired is such as to deprive the testator of her own free will and agency, then it does become undue influence. In the absence of fraud or similar conduct, whether the influence is wrongful or undue depends not on the manner of influence, but on the degree of influence. Thus, even though influence is not acquired in any untoward manner, if it deprives the testator of his free agency, it is wrongful and undue. Blackhurst v. James, supra, 604; Dowie v. Sutton, 227 Ill 183, 197, 198, 81 NE 395 (1907) ; Burt v. Quisenberry, 132 Ill 385, 399, 24 NE 622 (1890).

 It would have been error to give the instruction as tendered because it did not contain any qualification providing that if the result of the kindness was to substitute the will of another for that of the testator, it would then be undue influence. In Waters, the court held that it was error to refuse to give an instruction such as was tendered here. But, the case was reversed on a number of grounds, and the statement of the court that the refusal to give the instruction constituted error, must be viewed in light of the other findings. The court also found that the determination of the jury of lack of capacity and of undue influence was contrary to the manifest weight of the evidence. Burt v. Quisenberry, supra, was cited by the court as authority for holding that the refusal to give the instruction constituted error and the court quoted these words from Burt at page 399: "Undue influence means wrongful influence. But influence secured through affection is not wrongful, and therefore,

105

although a deed be made to a child at his solicitation, and because of partiality induced by affection for him, it will not be undue influence. . . . *The influence, to render the conveyance inoperative, must be of such a nature as to deprive the grantor of his free agency.*" (Emphasis ours.)

In Waters, the court was aware that influence sufficient to destroy a free agency is wrongful or undue influence. Its criticism of the instruction undoubtedly was based upon the fact that it found that there was no evidence of undue influence on the part of those so charged, but that such persons exercised only normal influence which resulted from kindness and attention to the recipient.

The defendant also objects in this court to the giving of one of plaintiff's instructions. While the plaintiff points out that the defendant did not object to this instruction at the conference on instructions, the instruction is proper. There is evidence to support the instruction and it conforms to the legal principles we have heretofore set forth.

The defendant also complains of a certain remark made by counsel for the plaintiff in the closing argument. The closing argument, however, was not included in the record and, thus, there is nothing before us to consider with reference to this contention. Department of Public Works and Buildings v. Bloomer, 28 Ill2d 267, 275, 191 NE2d 245 (1963).

In view of our conclusions, the judgment of the trial court is affirmed.

Judgment affirmed.

MORAN and ABRAHAMSON, JJ., concur.