2022 IL App (2d) 210053
No. 2-21-0053
Opinion filed August 10, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* ESTATE OF MARK A. COFFMAN, Deceased | ) ) ) ) | Appeal from the Circuit Court of Kendall County. |
| | ) | No. 18-P-65 |
| (Peggy LeMaster and Kathleen Martinez, Petitioners-Appellants v. Dorothy Coffman and Courtney Coffman Crenshaw, Respondents-Appellees). | ) ) ) ) ) | Honorable Melissa S. Barnhart, Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices McLaren and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Petitioners, Peggy LeMaster and Kathleen Martinez, contested the validity of the 2018 will of their deceased brother, Mark A. Coffman, which was executed six weeks before he died. See 755 ILCS 5/8-1 (West 2020). Petitioners named as respondents Dorothy Coffman, Mark's surviving spouse, and Courtney Coffman Crenshaw, Mark's daughter from a previous relationship. They alleged that Dorothy exerted undue influence over Mark to procure the will, rendering it invalid. Following the close of petitioners' case in a bench trial, the trial court granted Dorothy's motion for a directed finding (735 ILCS 5/2-1110 (West 2020)), determining that petitioners had failed to establish a *prima facie* case of either actual or presumptive undue influence. Petitioners appeal, arguing that the trial court erred in failing to apply (1) a presumption of undue influence where a fiduciary relationship existed, because it erroneously analyzed two elements required for

the presumption to apply—the existence of a fiduciary relationship and the fact that Dorothy procured the will—and (2) the alternative presumption allegedly required where, irrespective of a fiduciary relationship, the chief beneficiary procures the will of a debilitated testator. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Mark and Dorothy married in 1994. Neither was previously married, and they had no children together.

¶ 4    Mark worked at Coffman Truck Sales, Inc. (Coffman Truck Sales), a family truck sales, services, and parts business founded in 1948 by Mark's father, Glenn Coffman. Mark began working full time at the company at age 20 and continued working there until his death, at age 68, on April 26, 2018. (Mark was president of Coffman Truck Sales from 1992 to his death.) At his death, Mark owned 66.7% of the company's outstanding shares and 33.3% of the membership interests in Coffman Real Estate, L.L.C. (Coffman Real Estate), the entity that owns the real estate on which Coffman Truck Sales operates. Petitioners have never been owners of Coffman Truck Sales.

¶ 5    On August 4, 2001, Mark executed a will (2001 will) drafted by attorney John N. Rooks, who was a partner at Hynds, Rooks, Yohnka, Mattingly & Bzdill. Also on that date, Mark appointed Dorothy as his agent under powers of attorney for health care and property. In the 2001 will, Mark left all residences and tangible property to Dorothy, as well as his entire residuary estate (in a marital or family trust). He made a $100,000 bequest to Courtney and left the remainder of his estate in a family trust or a marital trust, under Dorothy's management and control as trustee. The 2001 will directed Dorothy, as trustee, to distribute to herself—as she deemed necessary or advisable for her health and maintenance in reasonable comfort—all trust income from both the marital trust and the family trust along with any trust principal, with the exception of certain

excluded assets. The 2001 will classified as excluded assets Mark's ownership interests in Coffman Truck Sales and Coffman Real Estate (or the proceeds from their sale under any operative buy/sell agreement in existence upon his death). It also prohibited Dorothy or any successor trustee from distributing during her lifetime the portion of trust principal comprised of excluded assets, and it directed the distribution of excluded assets, after Dorothy's death, to *petitioners*, if living, or, if not living, then *per stirpes* to their descendants.

¶ 6    In June 2016, Mark was diagnosed with laryngeal cancer, and he underwent treatments that included multiple surgeries (including removal of his larynx and lymph nodes and a tracheostomy), radiation, and chemotherapy. In July 2016, he underwent surgery to remove cancer in his left lung and, in 2017, underwent multiple surgeries to repair fractures in his arm. Over the next 21 months, the cancer metastasized widely and, by late 2017 and early 2018, the cancer had spread to his hip and other locations.

¶ 7    On January 30, 2018, Mark was admitted to Rush University Medical Center (Rush) for control of increased pain in his arm, and he advised his physician that he was concerned that the metastasis in his groin was growing. On Sunday, March 11, 2018, Dr. John Showel, Mark's oncologist at Rush, referred Mark to the emergency room, and he was admitted to the hospital that day as an inpatient. Mark never returned home. He underwent an MRI for which he was sedated with anesthesia in order to be comfortable during the procedure. The anesthesia and his pain medications caused Mark to exhibit symptoms of delirium and confusion. On March 15, 2018, Dr. Showel advised Mark's family that Mark had only about six to eight weeks to live and recommended hospice care.

¶ 8       On March 16, 2018, after speaking to Dorothy on the telephone sometime after 3 p.m., attorney John Hynds and his partner H. Katie McInerney began drafting estate planning documents for Mark.

¶ 9       On Saturday, March 17, Hynds traveled to Chicago to meet with Mark at Rush about executing a new will. He arrived midday and brought estate planning documents. Hynds's legal assistant, Lisa Barkley, accompanied Hynds at his request so that she could serve as an attesting witness.

¶ 10      In his hospital bed, Mark executed the new will on March 17, 2018 (2018 will), with Hynds and Barkley serving as witnesses. Dorothy participated in the discussions with Mark and Hynds about the documents. The following day, Hynds telephoned Dorothy to ask whether she and Mark were satisfied with the new will and whether they had other questions or further changes. In July 2018, Hynds sent an invoice for his firm's work.

¶ 11      Both the 2001 and 2018 wills provide for a $100,000 bequest to Courtney and a bequest of all residences and tangible personal property to Dorothy. They differ, however, in their disposition of the residuary interest in Mark's estate after the later of his and or Dorothy's deaths. The 2018 will permits Dorothy, not petitioners, to designate the ultimate disposition of trust assets, if she survives Mark. In doing so, it provides that the residuary estate is to be partially distributed to a family trust and partially to Dorothy outright. Specifically, the family trust is to be funded in the amount of the tax-sheltered gift amount (about $4 million at the time of Mark's death) with a preference to include the shares of Coffman Truck Sales and Coffman Real Estate in the family trust funding. Dorothy, as trustee of the family trust, is permitted to distribute to herself all trust income, along with any trust principal, she deems "necessary or advisable" for her health and

maintenance in reasonable comfort. She is also permitted to direct the further distribution of the family trust upon her death through her exercise of a power of appointment.

¶ 12    On April 9, 2018, Mark was at the Springs at Monarch Landing Health Center, a rehabilitation facility. On April 15, 2018, Dorothy and Mark determined to commence end-of-life hospice care for Mark. Mark died on April 26, 2018, at age 68.

¶ 13    On May 9, 2018, Dorothy petitioned the court for probate of the 2018 will. On May 17, 2018, the 2018 will was admitted to probate.

¶ 14                    A. Petition to Contest Validity of 2018 Will

¶ 15    On October 22, 2018, petitioners filed a verified petition to contest the validity of the 2018 will, seeking entry of an order declaring the 2018 will invalid and instead admitting the 2001 will to probate. Petitioners noted that the 2018 will revoked the 2001 will and made a material change in Mark's disposition of his interests in certain family businesses, to the detriment of petitioners and to the benefit of Dorothy. They asserted that the 2001 will contained provisions ensuring that the family business remained with Glenn's descendants. It left Mark's interest in Coffman Truck Sales and Coffman Real Estate in trust, for the benefit of Dorothy during her lifetime, to be distributed at her death to petitioners, if then living, or to their respective descendants. The 2018 will, petitioners noted, lacked any provisions ensuring that ownership of the family business interests remained with the founder's descendants. Instead, it granted complete power and discretion to Dorothy over the ultimate disposition of the interests. The 2018 will granted Mark's ownership interests partially to Dorothy outright and the rest to her as trustee of the family trust, also giving her the power to appoint under her own will the recipients of those interests held in trust at her death.

¶ 16     Petitioners argued that the 2018 will was invalid and resulted from undue influence Dorothy exerted over Mark. It was executed, they asserted, when Mark was physically and psychologically weakened and vulnerable to undue influence by, and dependent on, Dorothy. They noted that, during his last month, Mark took regular doses of morphine. During the week of March 11, 2018, a Rush staff oncologist advised the family that Mark likely had no more than one or two months to live. On March 17, 2018, he executed the 2018 will. He underwent another surgery on his right arm on March 19. Petitioners argued that Dorothy became the dominant party in a fiduciary relationship in which Mark grew heavily dependent on her, including for assistance with activities of daily living and financial matters, and reposed trust and confidence in her. By March 2018, Mark relied primarily on text messaging to communicate, and he depended on Dorothy to communicate with family members, business associates, and medical personnel. Petitioners asserted that Dorothy exercised her power of attorney for property in April 2018 to execute an amended limited liability company operating agreement for Coffman Real Estate.

¶ 17                                  B. Hearing

¶ 18                          1. *Petitioner Peggy LeMaster*

¶ 19     The hearing commenced on November 30, 2020. LeMaster testified that she worked at the family business in high school and through her twenties. LeMaster has an interest in Coffman Real Estate, which owns two parcels.

¶ 20     Mark was a hands-on manager and very detail oriented. He worked from early morning to late at night and worked weekends, too. Mark built a home next to his parents' house in Plano, moved into it around age 40, and lived there until his death. Mark was still president of the company when he passed away.

¶ 21    Before Mark lost the ability to speak, LeMaster spoke to him on the telephone a couple of times per week. After he lost his ability to speak, they communicated via texts. LeMaster texted with Mark almost daily afterward. She received her last text from him on March 11, 2018, while he was on his way to Rush.

¶ 22    LeMaster went to Rush on March 15, 2018, and learned that Dr. Showel had stated that Mark was expected to live another six weeks and that the family should arrange for hospice care for him. LeMaster saw Mark in his room. He had been given anesthesia three days earlier in order to undergo an MRI. He was having difficulty coming out of the anesthesia, and he was "pretty out of it." The following day, Dorothy texted LeMaster that Mark was doing "much better. Sitting up on side of bed. Ate a little breakfast." On March 17, 2018, the day Mark executed his 2018 will, Dorothy texted that Mark was "doing good. Ate some breakfast. *** Pain is better." The following day, Mark had surgery. On March 19, 2018, Dorothy texted that Mark was "pretty dopey" and could not keep his eyes open. At the end of the day, he was still confused.

¶ 23    An April 7, 2018, text from Dorothy stated that Mark was "really tired. Just eats a little bit. Looks like he has lost more weight. I don't know what to think." Between April 7 and 26, 2018, LeMaster visited Mark in a rehabilitation facility in Naperville almost daily. His condition was "grave," and he was on heavy doses of medication for his pain. He would reach for something in the air, but nothing was there. He was "really out of it."

¶ 24    In April 2018, about one week before Mark died, LeMaster signed two partnership documents for Coffman Real Estate and Coffman Brothers, L.L.C. (Coffman Brothers). She was at the rehabilitation center, in Mark's room. Dorothy presented the documents to LeMaster, explaining that they were going to save them money in taxes and that she needed LeMaster to sign them. LeMaster asked if she could take them home to review them, but Dorothy "was in a hurry

for them." LeMaster did not take them home. Mark was in his bed and "out of it." He did not speak.

¶ 25    On cross-examination, LeMaster testified that she had a good relationship with Dorothy. They spent holidays together, and she was a good wife to Mark and took care of him when he became ill. She texted for him when he could not do so on his own, took him to his medical appointments, and stayed with him at the hospital. However, Dorothy overpowered Mark's will through undue influence relating to his 2018 will. LeMaster, however, was not present when the will was executed or for any conversations between Mark and Dorothy related to it. Mark never told LeMaster that Dorothy was pressuring him to make a will or to do anything concerning the disposition of his business.

¶ 26    In February 2018, Mark still went in to work, although not daily. Texts from March 2, 2018, reflected that Mark was involved in Coffman Truck Sales work related to a bid due to UPS, which represented over 50% of the company's sales, by March 8, 2018.

¶ 27    On March 15, 2018, at the hospital, Dorothy told LeMaster that lawyers were coming to see Mark and that they needed to work on their will. After March 17, LeMaster saw Mark and he did not express any concern about a will he had executed or state that he was pressured into something by Dorothy.

¶ 28    LeMaster never discussed with Mark his 2001 will or what was going to happen to Coffman Truck Sales. Glenn, who died in 1991, did not leave any shares of the company to LeMaster or her sister. LeMaster's sons worked at the company but quit before Mark passed away.

¶ 29    On April 22, 2018, while at the rehabilitation facility, LeMaster learned from Dorothy that in his 2018 will Mark was leaving his interests in the company to Dorothy. Mark was in his bed at the time and "completely out of it."

¶ 30                                         2. *Dr. John Showel*

¶ 31     Dr. Showel's videotaped evidence deposition was played. Dr. Showel, a board-certified oncologist and hematologist, is on staff at Rush. He testified that, between July 2016 through March 2018, Mark was his patient. He saw him every one or two months. However, while Mark was hospitalized at Rush, Dr. Showel saw him nearly every day through the end of March 2018.

¶ 32     On March 11, 2018, Mark went to the emergency room and then was admitted to the hospital. Dr. Showel sent Mark for an MRI on March 11, 2018. A March 12, 2018, examination note stated that Mark was alert and oriented. It did not note confusion. A March 13, 2018, note by Dr. Showel stated that Mark had fallen on the floor of his hospital room as he exited his bed and was very confused and sleepy. Mark exhibited signs of acute delirium. Around midnight, a nurse noted that Mark was oriented to person and place. A March 14, 2018, progress note by Dr. Butos noted that Mark would be treated for two to three days in an effort to clear his delirium. At this point, Dr. Showel expected that, upon discharge, Mark would require assistance in the pursuit of daily living. Also on that day, at 3:34 p.m., Dr. Showel noted that Mark remained somewhat confused but was better than the prior day.

¶ 33     On March 15, 2018, Mark was in bed most of the time. Dr. Showel recommended hospice care. He believed that specific treatment for Mark's cancer was likely to be futile and that the focus should be on comfort. At this time, Mark's pain level was at 8 or 9 out of 10, "unless he was confused or very somnolent because of opioids." Dr. Lin's note on that date stated that Mark was much more oriented to place and time. Gabapentin, IV morphine, Klonopin, and morphine "SR" were discontinued on March 14, though another note stated that morphine and Norco would be given again. Dr. Showel testified that morphine can potentially diminish cognitive functioning. A March 15, 2018, note by Dr. Showel did not note any confusion. Dr. Lin noted that Mark was

much more oriented to date, place, and time and was still weak but that his mental status seemed normal. Dr. Showel testified that, thus, any concerns about Mark's mental status would have subsided by March 15. The note stated that Mark had improved significantly, *i.e.*, his delirium "got better" after his narcotics were held (*i.e.*, discontinued on March 14. On March 15 and 16, Dr. Showel did not notice any more confusion. Also on those dates, he discussed Mark's care with Mark himself. A March 16 nurse's note stated that Mark remained oriented and alert and that his pain improved with resuming his morphine.

¶ 34    On March 17, 2018, Mark's attorney visited him. A March 17 hospital note stated that Mark noted that his attorney was coming in and that he had commented, " 'my wife is unhappy with me because I've been dragging my feet on this.' " A March 17, 2018, note by Dr. Lin stated that Mark remained oriented and alert and that his lawyers were coming that day to meet with him and Dorothy about his will. (Dr. Showel did not see Mark on the day Mark executed his 2018 will.) A March 18 note from Dr. Lin stated that Mark's acute delirium was "now resolved." Dr. Showel next saw Mark on Monday, March 19, 2018. A progress note stated that Mark was alert and obeyed commands. There was no notation concerning any confusion. Notes from the following two days also did not mention any confusion on Mark's part.

¶ 35    During the middle of March 2018, Mark was sometimes alert and other times he was not alert. Toward the end of March, Mark was not making any decisions concerning his care.

¶ 36    Dr. Showel further testified that Mark made the decisions concerning his care, except toward the end, when he was not making any decisions. When asked if Mark's pain medications (*i.e.*, morphine, gabapentin, and hydrocodone acetaminophen) allowed him to still make decisions on his own, Dr. Showel replied, "It's possible, yes." When asked if it necessarily reflected that he had diminished capacity, he replied, "Not necessarily."

¶ 37                                    3. *Attorney John Hynds*

¶ 38    Attorney Hynds testified that he has practiced at his firm, Hynds, Yohnka, Bzdill & McInerney, for over 50 years, focusing on estate planning and estate administration. He represents Dorothy as executor of Mark's estate. When Hynds works with couples, he represents and acts on behalf of both. Thus, he represented Mark and Dorothy. However, Mark's 2018 will reflected Mark's wishes.

¶ 39    Around 2000, Hynds handled Glenn's estate. Prior to the execution of the 2018 will, Hynds did not communicate with Mark about his will or estate plan.

¶ 40    On March 16, 2018, Hynds received a phone call from Dorothy. He called her back around 3 p.m. Dorothy stated that Mark wanted to change his will, including changes recommended in a 2009 letter from Hynds's partner John Rooks concerning the decoupling of the Illinois estate tax from the federal estate tax and leaving Mark's estate outright to Dorothy, "totally under her control." Dorothy also stated that, if she predeceased Mark, one-half of her estate was to go to Mark's nieces and nephews and one-half to her nieces and nephews. During this conversation, Hynds did not ask to speak to Mark. Dorothy indicated that Mark was able to communicate.

¶ 41    That afternoon and early the next morning, Hynds and McInerney started working on the will (actually, three options: two wills disinheriting Mark's sisters and one codicil; the draft codicil took advantage of the 2009 tax change and would not have changed the disposition of assets but would have left the beneficiaries the same as in the 2001 will). Neither Hynds nor anyone at his firm communicated with Mark before the drafts were completed.

¶ 42    On March 17, 2018, at 11 a.m., Hynds arrived at Rush with Barkley. Hynds, Mark, and Dorothy discussed the estate plan together. Barkley was also in the room. Mark stayed in bed. Hynds did not ask to speak privately to Mark, nor did he afford Mark the opportunity to read the

will privately. Hynds and Barkley witnessed the execution of Mark's will. Once the tax consequences were explained to Dorothy, she acquiesced to Mark's preference of the family trust over leaving the property to her outright. At the hospital, Dorothy initially stated as to the recommendation to use a family trust structure, "What difference does it make?" and "People are lucky they're getting the inheritance." However, she came to see the benefits of that recommendation due to the tax benefits. Thus, initially, she and Mark were in disagreement. Ultimately, "she acquiesced and *** [Mark] decided."

¶ 43    On March 18, 2018, after the will was executed, Hynds prepared a memo concerning the events leading to the will's execution. In the memo, he stated that Dorothy had indicated that she and Mark knew years ago that Mark should have changed his estate plan and were aware of Rooks's letter warning of additional estate taxes. She stated that they both wanted Dorothy to have total control of all assets after Mark's death. They did not want the marital trust and did not want petitioners to inherit after Mark and Dorothy both died. Hynds also wrote that a key was that Dorothy could, through her estate plan, direct the distribution of all assets.

¶ 44    He testified that this "was a key for Mark." When asked what Dorothy said about her power to direct the distribution of all assets through her estate plan, Hynds replied, "She made no specific comments about it. Mark was the one that was doing the talking." Hynds further testified that, once he explained to them how the limited power of appointment would work and how it would also save taxes, "Mark had indicated that that's what he wanted." Dorothy, according to Hynds, acquiesced to Mark's "decision that the use of the trust for the limited power of appointment would allow her to have the type of control that he was wanting her to have but also obtain the tax benefit."

¶ 45    Mark directed Hynds to cross out a section in the draft will that provided that petitioners would have a right of first refusal upon the sale or transfer of Mark's ownership interests in

Coffman Truck Sales and Coffman Real Estate. Mark "did not want there to be any legal restriction on how he viewed Dorothy's ability to make whatever decision she wanted regarding the disposition of it." Mark, Hynds, and Barkley initialed the change.

¶ 46    Hynds testified that "most of the conversation" was with Mark. Dorothy did not "identify specific things that Mark wanted. Mark told [Hynds] what he wanted." Dorothy did speak, "but Mark was the one that was—with whom [Hynds] was primarily engaged." When Dorothy spoke, one of the things she mentioned was what Mark wanted in his will. Hynds read the will to Mark. Hynds estimated that Mark's estate was worth about $10 million.

¶ 47    Mark read the document along with Hynds. Mark held it in front of him, looking, and they would discuss a paragraph. Mark stated that he did not have good use of his right arm to sign the document and that Dorothy had been signing documents on his behalf. Hynds explained that Mark could mark an "X," but Mark used his left hand to sign the document.

¶ 48    When asked if he inquired as to why Mark wanted to give Dorothy control over the ultimate disposition of assets after his death, Hynds stated that he did not. "I asked him what—how he wanted to distribute his estate and he told me. I didn't ask for his motives." Dorothy had initially stated that this was Mark's wish, but, later, Mark told Hynds what he wanted. "I thought he was perfectly competent and understood what he told me that he wanted."

¶ 49    After March 17, 2018, Hynds did not communicate with Mark. On March 18, Hynds spoke to Dorothy, asking if they wanted anything else done. There were no other changes.

¶ 50    Hynds further testified that he understood that, when Dorothy called him on March 16, she was calling on Mark's direction and, the following day, Hynds understood through conversations with Mark that Dorothy had called on his behalf. On March 17, Dorothy did not ask to speak to Hynds outside of Mark's presence. When Hynds walked into Mark's hospital room, Mark

recognized him as soon as he entered and even though they had not seen each other in 20 years. Mark also remembered that Hynds wore hearing aids. "It gave me more confidence that—of his mental ability, of his capability." Mark's voice was very weak, but it was understandable. Hynds believed that, during his conversation with Mark, Mark understood the issues. Dorothy did not attempt to intervene. "Yes, it was basically a conversation between him and me."

¶ 51    When asked if the conversations on March 17 led Hynds to believe that Dorothy was overpowering Mark in connection with the making of his will, Hynds replied that she did not appear to have any real impact on Mark because Mark insisted that they use the trust, whereas Dorothy would have picked the outright distribution. Hynds believed that "Mark was the more dominant of the two in terms of the decision making that was involved."

¶ 52                                    4. *Attorney Peter Wilson Jr.*

¶ 53    Peter Wilson Jr., an attorney with Mickey, Wilson, Weiler, Renzi, Lenert & Julien, testified that he has practiced law for over 53 years. He represents school districts and public bodies and does corporate work and some real estate work. Wilson's clients include Coffman Truck Sales, Coffman Real Estate, and Coffman Brothers. The parties stipulated that, in April 2018, Wilson prepared an amended operating agreement for Coffman Brothers and an amended operating agreement for Coffman Real Estate. Wilson e-mailed Jack Hienton, general manager for Coffman Truck Sales, and copied Diane Zimmerman, also at Coffman Truck Sales, stating that he had received a call from Dorothy that the limited liability company members had requested an amendment to take out the mandatory buyout from the two operating agreements. Wilson made the change to the operating agreements on April 9 and e-mailed the documents that day.

¶ 54    One week earlier, Wilson had spoken to Mark. They discussed the redemption of the shares of Coffman Truck Sales owned by Mark's uncle, Frank Coffman, and the termination of the

shareholder agreement that had the mandatory buyout language. Mark told Wilson that he did not want the mandatory buyout provisions in any of the documents. Next, he received a call from Dorothy, stating that the members wanted it removed from the two real estate limited liability companies.

¶ 55    The Coffman Truck Sales shareholder agreement (dated July 8, 2006) provided that, upon the death of a shareholder, all the shares shall be sold to and purchased by the company. Wilson or Hynds's firm drafted the termination-of-shareholder agreement, dated April 13, 2018. It was prepared to address the issue of the mandatory buyout language in the Coffman Truck Sales shareholder agreement.

¶ 56    In March or April 2018, Wilson spoke to Mark about the mandatory buyout and how it posed difficulties for Frank's estate. Mark, who had difficulty speaking, asked if the provision was necessary, and Wilson told him it was not. Mark stated that he wanted it removed from the entities' documents. Wilson understood that Mark was in a rehabilitation facility. During one conversation, Mark had his phone on speaker mode, and Dorothy repeated Mark's words and Mark would say "yes." Mark was engaged during the call. "[T]here was no question that he knew what he was asking me." During these conversations, it did not appear to Wilson that Mark was being pressured into making changes to the entities' documents.

¶ 57                                5. *Lisa Barkley*

¶ 58    Barkley testified that she has worked for Hynds's firm for over 40 years. She is a legal assistant. She signed Mark's 2018 will as a witness. When Barkley and Hynds arrived at the hospital and before entering Mark's room, they spoke to a nurse and Hynds asked if Mark was lucid. The nurse stated that Mark was having a good day. When they entered the room, Barkley saw Mark in bed and Dorothy at the far side of the room in a chair. Mark recognized Hynds, and

they talked about how it had been a while since they had seen each other. Barkley sat with Dorothy, and Hynds stood by Mark's bed most of the time. Hynds went over the will with Mark and answered Mark's questions. It appeared to Barkley that Mark understood the issues Hynds discussed with him. He asked intelligent questions, as reflected in his questions about estate tax consequences.

¶ 59     When Mark spoke, his voice sounded raspy. Dorothy was present the entire time, and she participated in the discussion. She was curious, asked questions, and wanted to understand what was happening. She appeared calm. "Dorothy's personality is somewhat excitable, and I did not feel like she was overly wound up or overly excited." Barkley further testified that it did not appear that Dorothy pressured Mark in any way. Dorothy asked Hynds questions about the process. She did not ask Mark questions or tell Mark what he should do. Mark reviewed a copy of the will as Hynds read it to him. Hynds read the majority of the will to Mark. They discussed estate taxes. Also, there was a section of the will that Mark did not agree with, and it was deleted. The real estate entities (*i.e.*, Coffman Real Estate and Coffman Brothers) were also discussed.

¶ 60     Barkley believed that, at the time she signed as a witness to Mark's will, Mark was of sound mind and memory when he signed it. She had known Mark for a number of years from working at Hynds's firm. She had met him seven or eight times and they had lengthy phone conversations over the years. On March 17, 2018, based on what she knew about him and observing what occurred during the will execution, she believed that Mark knew what he was doing. He was more than competent to proceed with the execution of the will.

¶ 61                  6. *Respondent Dorothy Coffman*

¶ 62     Dorothy testified that she was 42 years old when she married Mark and that he was 43 years old. Mark was president of Coffman Truck Sales during their marriage and until his death.

Dorothy did not work at the company. Mark worked there with Glenn and uncles, cousins, and nephews of Mark's. He worked long hours.

¶ 63    Mark executed his 2001 will when they had been married for six years. The 2018 will provides for the entire estate to go for Dorothy's benefit.

¶ 64    On March 13, 2018, Mark was in a state of delirium. The next day, he knew where he was. "[H]e still was communicating with me like he knew who I was and asking me questions and stuff." They worked on taxes. However, hospital staff told Dorothy that Mark did not know the time and date.

¶ 65    When Hynds arrived at the hospital on March 17, he indicated that Mark, not Dorothy, was his client and, when Dorothy tried to speak, he told her not to do so.

¶ 66                            7. *Retired Attorney John Rooks*

¶ 67    Rooks, a retired attorney, testified that he practiced at Hynds, Rooks, Yohnka, Mattingly & Bzdill from 1976 to 2016. Over half of his practice was in estate planning, probate, and trust administration. Mark was his client, and he prepared his 2001 will, living will, and powers of attorney.

¶ 68                            8. *Michael Coffman*

¶ 69    Michael Coffman, Mark's cousin and part owner and an officer of Coffman Truck Sales, testified that he worked daily with Mark at the company from 2006 to 2018. Michael was vice president and secretary of the company and worked closely with Mark. Mark worked long hours and was a hands-on manager and did not delegate work. He made the business decisions for the company. Reviewing text messages between himself and Mark from March 10 to April 26, 2018, Michael testified that some of the messages were sent by Dorothy.

¶ 70                            9. *Petitioner Kathleen Martinez*

¶ 71    Martinez testified that she never discussed with Mark his estate plan and that Mark never told her anything about either his 2001 will or his 2018 will. Martinez worked at Coffman Truck Sales during high school, and her two sons worked there during high school and college. Her mother died in 2000. Between 2014 and 2017, Martinez saw Mark often. After Mark became ill, he texted more often and used the phone less. Martinez met Dorothy when they were both in high school. Dorothy was a good wife to Mark.

¶ 72    Martinez, LeMaster, and Mark had interests in Coffman Real Estate and Coffman Brothers, and Mark managed the properties.

¶ 73    On March 15, 2018, Dorothy texted Martinez that Mark was more alert, knew where he was and the date (which he did not know the prior day), and was more like himself that day. Martinez did not go to the hospital on March 17, because Dorothy asked her not to, because the lawyers were coming to work on Mark's will.

¶ 74    Dorothy was in Mark's hospital room whenever Martinez visited. Prior to March 2018, when family visited, Dorothy welcomed the opportunity to leave the room and go out to walk, have a cigarette, or get something to eat. However, after March 2018, she did not leave the room. "It was strange, you know, because she would not leave us [(*i.e.*, the family)] alone in the room with Mark." However, Martinez did not ask Dorothy to leave her alone with Mark. Prior to the filing of the will contest, Martinez did not see Dorothy urging or persuading Mark to execute the 2018 will and no one told her that they saw Dorothy doing so.

¶ 75    In the spring of 2018, Martinez signed documents relating to the real estate entities. The signing occurred at the Springs at Monarch Landing Health Center, while she was visiting Mark. "Mark was not coherent." Dorothy asked Martinez to sign the documents, explaining that there were going to be tax benefits as a result. She also stated that Martinez did not need to read them.

¶ 76    During Mark's final days or weeks (perhaps 1 week to 10 days before he died), there was a meeting between Martinez and her husband, LeMaster and her husband, and Dorothy concerning Coffman Truck Sales. The meeting occurred in the room next door to Mark's room. Petitioners asked Dorothy what was going to happen to the family business, and Dorothy was "very upset and nervous and defensive about us doing that. She felt that it wasn't the right time." Dorothy "got loud." She also stated that "she was going to be in control of everything" and "would have majority ownership." Mark was "comatose," meaning that he was not communicating with anyone. Martinez knew that Mark was near the end of his life. There was no reason that they could not wait to have the conversation until after Mark had passed away.

¶ 77                          C. Dorothy's Motion for a Directed Finding

¶ 78    On January 4, 2021, after the close of petitioners' case-in-chief, Dorothy moved for a directed finding (735 ILCS 5/2-1110 (West 2020)). She argued that petitioners failed to present sufficient evidence (*i.e.*, a *prima facie* case, that is, at least some evidence on every element essential to the cause of action (*Kokinis v. Kotrich*, 81 Ill. 2d 151, 154-55 (1980))) that Dorothy unduly influenced Mark or that the court should presume that she did so; specifically, they failed to present a *prima facie* case of either actual undue influence or presumptive undue influence. As to the latter, Dorothy maintained that she was not a fiduciary, she was not a disproportionate beneficiary as compared to petitioners, she was not in a dominant role, Mark did not place extraordinary or unusual confidence in her, and Dorothy did not procure the 2018 will and was not instrumental in its procurement.

¶ 79                          D. Trial Court's Ruling

¶ 80    On January 11, 2021, the trial court granted Dorothy's motion for a directed finding and found that the 2018 will was valid and admitted it to probate. It denied petitioners' verified petition

to contest the validity of the 2018 will. In announcing its ruling, the court noted that it determined that there was no evidence of actual undue influence. The court then considered factors that establish presumptive undue influence and found that no *prima facie* case was established. First, although Dorothy was appointed power of attorney, she was not a fiduciary, because no evidence showed that she acted under the powers of attorney for health care or property either to materially benefit herself or for a third party. Next, addressing the difference between substantial benefit and comparatively disproportionate benefit, the court found that Dorothy was a substantial beneficiary in both the 2001 and 2018 wills. Her benefits did not decrease, and her control over the property of appointment upon her death was the change in the 2018 will. As to the second factor—whether Mark was in a dependent situation where Dorothy was in a dominant role—the court found that it was not met where the marriage spanned 24 years and Mark made his own treatment decisions and instructed Dorothy to contact his longtime attorneys. "Mark controlled the scenario." As to the third factor—whether Mark placed extraordinary trust and confidence in Dorothy—the court determined that there was no evidence of unusual decisions concerning Mark's confidence in Dorothy. The fourth factor—whether the will was prepared or executed in circumstances where Dorothy was instrumental or participated—was also not met, the court found, because Mark was fully engaged in the discussions of the various estate planning options and disagreed with Dorothy's suggestion at one point that she be given an outright bequest and he decided in favor of a tax-saving vehicle. The court noted that Mark's competence was not in dispute. Petitioners, the court noted, were never in expectancy to own Coffman Truck Sales, referencing the shareholder agreement's buyout provisions that any deceased shareholder's shares had to be purchased back by the company. "So they would not have been in line to inherit the business to begin with." Petitioners appeal.

¶ 81                                    II. ANALYSIS

¶ 82    Petitioners argue that the trial court erred in failing to apply (1) a presumption of undue influence where a fiduciary relationship existed, because it erroneously analyzed two elements required for the presumption to apply—the existence of a fiduciary relationship and the fact that Dorothy procured the will and (2) the alternative presumption allegedly required where the chief beneficiary procures the will of a debilitated testator. For the following reasons, we reject petitioners' arguments.

¶ 83    Section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2020)) permits a defendant to move for a directed finding at the close of the plaintiff's case in a bench trial. In ruling on such a motion, the trial court engages in a two-step analysis. *Minch v. George*, 395 Ill. App. 3d 390, 398 (2009). Initially, the court must determine whether the plaintiff presented a *prima facie* case as a matter of law. *Edward Atkins, M.D., S.C. v. Robbins, Salomon & Patt, Ltd.*, 2018 IL App (1st) 161961, ¶ 53. If the court finds that the plaintiff presented a *prima facie* case, it proceeds to the second step and weighs the evidence to determine whether the *prima facie* case survives. *Minch*, 395 Ill. App. 3d at 398. Where the trial court did not proceed beyond the first stage, we review *de novo* its determination. *In re Petition to Disconnect Certain Territory Commonly Known as the Foxfield Subdivision & Adjoining Properties From the Village of Campton Hills*, 396 Ill. App. 3d 989, 992 (2009) (*In re Foxfield Subdivision*). "Generally, in ruling on a section 2-1110 motion, evidence examined under the second prong must prove the plaintiff's case by a preponderance of the evidence." *Law Offices of Colleen M. McLaughlin v. First Star Financial Corp.*, 2011 IL App (1st) 101849, ¶ 40. We uphold the granting of a section 2-1110 motion, unless the judgment is against the manifest weight of the evidence. *Kokinis*, 81 Ill. 2d at

154. A judgment is against the manifest weight of the evidence where the court's findings are not reasonable. *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001).

¶ 84    Undue influence sufficient to invalidate a will is influence that prevents a testator from exercising his or her own free will in the disposition of his or her estate or that deprives the testator of free agency and renders the will more that of another than his or her own. *In re Estate of Julian*, 227 Ill. App. 3d 369, 376 (1991).[1] Undue influence must be directly connected with the execution of the instrument, operate at the time it was made, and be directed toward procuring the will in favor of a particular party or parties. *In re Estate of Maher*, 237 Ill. App. 3d 1013, 1017 (1992).

¶ 85    Generally, undue influence may be shown by either (1) proof of conduct that constitutes actual undue influence or (2) a fiduciary relationship and other conduct that raises a presumption of undue influence. See *Sears v. Vaughan*, 230 Ill. 572, 573 (1907) (distinguishing between actual undue influence and presumptive undue influence); *In re Estate of Kline*, 245 Ill. App. 3d 413, 424 (1993) (where there is no presumption, a plaintiff must produce specific evidence of actual undue influence (citing Illinois Pattern Jury Instructions, Civil, No. 200.03 (3d ed. 1992), Procedural Effect)). Here, petitioners challenge only the trial court's determination that no presumption applied in this case, not its determination that there was no actual undue influence.

---

[1]Testamentary capacity—*i.e.*, soundness of mind and memory (*DeHart v. DeHart*, 2013 IL 114137, ¶ 20), the test of which is that "the testator must be capable of knowing what his [or her] property is, who are the natural objects of his [or her] bounty, and also be able to understand the nature, consequence, and effect of the act of executing a will" (*Dowie v. Sutton*, 227 Ill. 183, 196 (1907))—is not at issue in this case.

¶ 86    Turning to the presumption of undue influence, such a presumption will arise where (1) a fiduciary relationship exists between the testator and a substantial and comparatively disproportionate beneficiary under the will, (2) the testator is in a dependent situation in which the substantial and disproportionate beneficiary is in a dominant role, (3) the testator reposes trust and confidence in such beneficiary, and (4) the will is prepared or procured and executed in circumstances wherein such beneficiary is instrumental or participated. See *Kline*, 245 Ill. App. 3d at 422; *DeHart v. DeHart*, 2013 IL 114137, ¶ 30. Dorothy contends that the first and fourth elements were not shown. We agree, and because our determination on these two elements suffices to uphold the trial court's judgment, we do not address the remaining elements.

¶ 87    Here, the trial court determined that (1) Dorothy was not a fiduciary; (2) Mark made his own treatment decisions, instructed Dorothy to contact his longtime attorneys, and controlled the process; (3) there was no evidence of unusual decisions concerning Mark's confidence in Dorothy; and (4) Mark was fully engaged in the discussions of the various estate planning options and disagreed with Dorothy's suggestion at one point that she be given an outright bequest and decided in favor of a tax-saving vehicle. The court also noted that petitioners did not have an expectancy to own Coffman Truck Sales.

¶ 88    To establish a *prima facie* case of the elements necessary to raise a presumption of undue influence, a plaintiff must proffer at least some evidence on every essential element of the cause of action. *Nemeth v. Banhalmi*, 125 Ill. App. 3d 938, 960 (1984); *In re Foxfield Subdivision*, 396 Ill. App. 3d at 992. Once a *prima facie* case has been established, the burden is on the proponent of the will to present evidence tending to rebut the presumption. *Kline*, 245 Ill. App. 3d at 423. The amount of evidence required to rebut the presumption is not determined by a fixed rule, but where, for example, a strong presumption arises, a party may have to respond with substantial

evidence. *Nemeth*, 125 Ill. App. 3d at 960 (citing *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 463 (1983)). For example, where a fiduciary relationship exists as a matter of law, courts require clear and convincing evidence to rebut the presumption. *Id.* Thus, there is a three-part inquiry: (1) whether the plaintiff established a *prima facie* case of undue influence; (2) if the *prima facie* case was established, whether the defendants introduced evidence sufficient to rebut the resultant presumption; and, (3) if the rebuttal evidence was sufficient, whether the court's determination that the will was the product of undue influence is contrary to the manifest weight of the evidence. *Id.* at 961.

¶ 89                    A. Presumption: First Element—Fiduciary Relationship

¶ 90    Turning to the first element—a fiduciary relationship between the testator and a comparatively disproportionate beneficiary under the will—petitioners argue first that the trial court erred in finding that no fiduciary relationship existed between Mark and Dorothy. They note that Dorothy was Mark's agent under his statutory short form power of attorney for property and, therefore, as a matter of law, she was a fiduciary. See *DeHart*, 2013 IL 114137, ¶ 31 ("As a matter of law, a power of attorney gives rise to a general fiduciary relationship between the grantor and the grantee."). Petitioners contend that the trial court erred in relying on *In re Estate of Stahling*, 2013 IL App (4th) 120271.

¶ 91    In *Stahling*, the court was presented with the certified question of whether the existence of a *health care* power of attorney created a fiduciary relationship that, as a matter of law, raised the presumption of undue influence in the execution of a deed that named the agent under the power of attorney as a joint tenant in the deed. *Id.* ¶ 1. The court answered the question in the negative. *Id.* It distinguished cases holding that a power of attorney creates a fiduciary relationship as a matter of law, determining that the case before it concerned a health care power of attorney and

that the case law involved powers of attorney involving "property and financial matters and their effect on property and financial transactions between the parties." *Id.* ¶ 19. Also, the cases did not address whether a health care power of attorney alone created a presumption of undue influence in property and financial transactions between the principal and the agent. *Id.* The court noted that the statutory short form power of attorney for health care does not require an agent to sign the document (*id.* ¶ 21 (citing 755 ILCS 45/4-10(a) (West 2004))) and that "it is only upon exercising granted powers that the agent is 'required to use due care to act for the benefit of the principal in accordance with the terms of the statutory health care power.' " *Id.* (quoting 755 ILCS 45/4-10(b) (West 2004)). Thus, to create a fiduciary relationship, the agent must accept the powers delegated by the principal, and the mere execution of a statutory power of attorney, "alone and without evidence of acceptance by the named agent," is not sufficient. *Id.* ¶ 22. The case law upon which the respondent relied involved the agent's acceptance of the relationship via his or her performance of authorized acts under the property powers of attorney. *Id.* Finally, the court held that, even when a health care power of attorney creates a fiduciary relationship, that relationship is limited to matters involving the principal's health care and does not extend to the control or management of property or financial matters *Id.* ¶¶ 23-26.

¶ 92    We disagree with petitioners that *Stahling* has no application here. The cases involving property and financial matters that *Stahling* distinguished, again, involved situations where the powers had been exercised and most did not involve statutory powers of attorney. See *In re Estate of DeJarnette*, 286 Ill. App. 3d 1082, 1088 (1997) (joint tenancy accounts, life insurance policy, and pension); *In re Estate of Miller*, 334 Ill. App. 3d 692, 697 (2002) (statutory power of attorney; transactions involved checking accounts and certificates of deposit); *In re Estate of Rybolt*, 258 Ill. App. 3d 886, 889 (1994) (joint tenancy accounts and payable on death certificates of deposit);

*White v. Raines*, 215 Ill. App. 3d 49, 59 (1991) (joint tenancy accounts and deed); *Lemp v. Hauptmann*, 170 Ill. App. 3d 753, 757 (1988) (check and deeds).

¶ 93    The statutory power of attorney document Mark executed in 2001, wherein he appointed Dorothy as his agent, provides,

> "NOTICE: THE PURPOSE OF THIS POWER OF ATTORNEY IS TO GIVE THE PERSON YOU DESIGNATE (YOUR 'AGENT') BROAD POWERS TO HANDLE YOUR PROPERTY, WHICH MAY INCLUDE POWERS TO PLEDGE, SELL OR OTHERWISE DISPOSE OF ANY REAL OR PERSONAL PROPERTY WITHOUT ADVANCE NOTICE TO YOU OR APPROVAL BY YOU. THIS FORM DOES NOT IMPOSE A DUTY ON YOUR AGENT TO EXERCISE GRANTED POWERS; BUT WHEN POWERS ARE EXERCISED, YOUR AGENT WILL HAVE TO USE DUE CARE TO ACT FOR YOUR BENEFIT AND IN ACCORDANCE WITH THIS FORM AND KEEP A RECORD OF RECEIPTS, DISBURSEMENTS AND SIGNIFICANT ACTIONS TAKEN AS AGENT."

Similarly, elsewhere, the document states,

> "The agent will be under no duty to exercise granted powers or to assume control of or responsibility for the principal's property or affairs; but when granted powers are exercised, the agent will be required to use due care to act for the benefit of the principal in accordance with the terms of the statutory property power and will be liable for negligent exercise."

Finally, the document provides that an agent "may not make or change a will."

¶ 94    At the time leading up to and including the execution of the 2018 will, Dorothy had not accepted or exercised the power of attorney for property that Mark granted her in 2001. Thus,

pursuant to the document, she was not a fiduciary who owed him a duty concerning his property. See also *In re Estate of Shelton*, 2017 IL 121199, ¶ 24 ("The [Illinois] Power of Attorney Act, which codifies an agent's fiduciary duty, recognizes that it is the agent's *exercise* of power pursuant to the authorizing document which triggers the agent's duty to the principal." (Emphasis added.)). Although Dorothy exercised the power of attorney to amend the real estate entities' documents around this time, she did so in April, about one month *after* Mark had executed his will, and these documents were not Mark's estate planning documents. Furthermore, as the final quoted provision makes clear, Dorothy had no power under the power of attorney Mark executed to make or change a will. Thus, petitioners' argument that Dorothy was a fiduciary as a matter of law also fails because Dorothy could not (via her alleged undue influence over him) have made or changed Mark's will thereunder.

¶ 95                    B. Presumption: Fourth Element—Procuring of Will

¶ 96    Next, turning to the fourth element—that the will was prepared or procured and executed in circumstances wherein the beneficiary was instrumental or participated—petitioners argue that the trial court erred in determining that Dorothy did not participate in procuring Mark's will. They contend that *de novo* review applies because the court erred applying the law concerning the governing test, relied on irrelevant matters, and misread controlling precedent. They also argue that the court's findings were against the manifest weight of the evidence.

¶ 97    Petitioners initially contend that the trial court confused and conflated two distinct issues: (1) whether a beneficiary's initiative in the making of the will and its execution establishes that he or she participated in its procurement as required to raise the presumption of undue influence and (2) whether that initiative establishes the ultimate issue, *i.e.*, that the will resulted from undue influence. The court, they urge, was required to decide the narrow question whether Dorothy was

"instrumental in procuring the execution of the will, or participated in its preparation and execution." *Swenson v. Wintercorn*, 92 Ill. App. 2d 88, 100 (1968); *DeHart*, 2013 IL 114137, ¶ 30. Petitioners assert that the trial court erroneously merged the two issues and bypassed the threshold question.

¶ 98     Initially, we disagree with petitioners that *de novo* review applies, and we disagree that the trial court conflated two issues. The procedural posture of this case is an appeal from the granting of a directed finding. The trial court was required to first determine whether petitioners presented a *prima facie* case as a matter of law and, if so, to weigh the evidence and determine whether the case survived. *Minch*, 395 Ill. App. 3d at 398. Petitioners contend that *de novo* review applies because the trial court misconstrued the governing test, considered irrelevant matter, and misread controlling precedent. We reject those arguments below. The trial court weighed the evidence and determined that petitioners' *prima facie* case did not survive. Accordingly, the manifest-weight standard applies. *Kokinis*, 81 Ill. 2d at 154.

¶ 99     Petitioners take issue with the court's finding that Dorothy did not procure preparation of the will, which was premised, they contend, on the irrelevant assumption that she called Hynds at Mark's request. Even if true, petitioners argue, any contention that Mark made such a request is irrelevant because the issue is whether Dorothy, a substantial beneficiary, procured the will or participated in its preparation and execution. Additionally, petitioners argue that the court should not have relied on Dorothy's self-serving testimony that she called Hynds at Mark's request.

¶ 100   We reject petitioners' argument. The fact that Dorothy made the call to Hynds's firm was evidence the court could have considered as supporting petitioners' *prima facie* case. Weighed against this was the evidence that rebutted this interpretation of Dorothy's call, which we discuss

below. Thus, Dorothy's call was not irrelevant and did not constitute the application of an incorrect legal test.

¶ 101   The evidence showed that, on March 15, 2018, one day before Dorothy called Hynds, Dr. Showel recommended hospice care for Mark because additional cancer treatment would have been futile. Dorothy testified that she called Hynds on March 16, at Mark's direction. Hynds's firm had prepared Mark's 2001 will. Hynds's and Barkley's testimony reflected that it was Mark who decided to make a new will and directed its contents. Hynds testified that he went to the hospital on March 17 with three documents containing various estate planning options and that he discussed the options with Mark, who directed the discussion and the decision making. Mark's behavior was consistent with Dorothy's testimony that Mark desired to execute a new will. Further, Mark's issues with speaking (due to his tracheostomy) showed why it was necessary for Dorothy to make the call on Mark's behalf the day before.

¶ 102   Petitioners argue that the court misconstrued certain case law. Compare *In re Estate of Glogovsek*, 248 Ill. App. 3d 784, 790, 798 (1993) (holding that trial court erred in applying presumption of undue influence by testator's wife, causing him to designate his stepchildren as contingent beneficiaries if his wife predeceased him, instead of his sister and her children; however, addressing the fourth element, the court noted that the facts that the attorney never discussed the testator's will with him outside the wife's presence, that the testator changed his mind as to whom he desired to leave his property, and that the wife conveyed to the attorney this message were important to consider in assessing this element and sufficient to meet the fourth element), *Maher*, 237 Ill. App. 3d at 1018-19 (reversing dismissal of count alleging undue influence; petition adequately alleged existence of fiduciary relationship, and that relationship— along with allegations that the will was prepared by an attorney hired by the respondent and that

the respondent was the sole beneficiary under the new will—were sufficient to state a cause of action; the respondent, who was the testator's niece, had taken possession of the testator's papers and made decisions concerning her care; testator was physically and mentally incapacitated, as she was diagnosed with senile dementia and, several days prior to the execution of her new will, could not recall either long or short term events without coaching; will was executed in the presence of the respondent and two of her coworkers), and *Swenson*, 92 Ill. App. 2d at 97-98, 101 (affirming directed verdict of undue influence, the plaintiff nephew asserted that the defendant niece and her husband, who had helped the testator, who had begun having difficulty managing her financial affairs, move into their home; the defendant opened a joint checking account with the testator and shared a safe deposit box with her, made arrangements for the defendant's and her husband's attorney to come to the defendant's home, and, at the meeting, the testator, the attorney, and the defendant discussed her estate plans; the new will and trust gave the overwhelming balance—"a substantial benefit"—of her estate to the defendant, whereas, in an earlier will, she was due one half), with *In re Estate of Lemke*, 203 Ill. App. 3d 999, 1005-07 (1990) (affirming trial court's entry of directed verdict, holding that evidence did not establish undue influence by the testator's cousin; cousin retrieved old will from safe deposit box, made appointment with attorney, drove the testator there, and was present when the new will was discussed with the attorney; no evidence reflected that she suggested or persuaded the testator to revise her will; although the testator looked at the cousin on occasion during the consultation with the attorney, the cousin did not offer advice or comment, and the testator stated her desires to the attorney; also no substantial benefit was conferred upon the cousin—she was named executor and received a bequest of a china cabinet).

¶ 103　We disagree that the court misconstrued or misapplied the case law and disagree that its procurement finding was against the manifest weight of the evidence. The facts here are unlike

those in *Glogovsek*, *Maher*, and *Swenson*. Although Hynds did not speak to Mark before arriving at the hospital to present the three estate planning options and did not speak privately to Mark while at the hospital, Hynds testified that it was Mark, not Dorothy, who directed the decisions concerning his 2018 will, Mark understood the process, and Hynds's firm had prepared Mark's 2001 will. Further, Dorothy participated only briefly in the conversation, and Mark overruled her initial preference of an outright distribution, choosing instead the trust option that minimized tax liability. Barkley testified that it did not appear to her that Dorothy pressured Mark in any way or told him what to do. Also, Hynds testified that Mark read along with Hynds through the will and they discussed it. We also disagree with petitioners that postexecution events showed Dorothy's role in procuring the will. They note that, after the will was executed, Hynds's only communication was with Dorothy and that Hynds sent to Dorothy an invoice and she paid it. However, as we noted above, Mark's speech issues prevented him from using a telephone to speak to Hynds, and, given that he was hospitalized, it is reasonable that Hynds's invoice was sent to Dorothy. The trial court's procurement finding was not against the manifest weight of the evidence.

¶ 104          C. Alternative Presumption in Absence of Fiduciary Relationship

¶ 105  Petitioners' final argument is that the trial court erred in failing to apply the presumption allegedly required where the chief beneficiary procures a will of a debilitated testator. They rely on the concept that "[t]he active agency of the chief beneficiary in procuring a will, especially in the absence of those having an equal claim on the estate of the testator whose mind is debilitated by age and illness, is a circumstance indicating the probable exercise of undue influence." *In re Estate of DiMatteo*, 2013 IL App (1st) 122948, ¶ 63 (citing cases). The presumption of undue influence " 'arises irrespective of the existence of a fiduciary relationship between the testator and the beneficiary.' " *Id.* (quoting *Maher*, 237 Ill. App. 3d at 1018).

¶ 106   However, as Dorothy notes, the concept has its origin in *Mitchell v. Van Scoyk*, 1 Ill. 2d 160, 172 (1953), which was overruled on this point by *Belfield v. Coop*, 8 Ill. 2d 293, 311 (1956). In *Belfield*, the supreme court, discussing *Mitchell* and other cases, stated that "[a]ny language in those opinions indicating that such a presumption might arise absent a fiduciary relationship was unnecessary and is expressly repudiated." *Id.* Thus, we reject petitioners' contention that the trial court erred in failing to apply the presumption concerning a debilitated testator. The concept is no longer good law.[2]

¶ 107   Furthermore, even if the presumption was a viable option, it would not apply here because, at a minimum, petitioners did not present a *prima facie* case that Mark was so debilitated or infirm due to his illness that he was overpowered by Dorothy's alleged exercise of undue influence. Dr. Showel testified that, on March 15, 2018, he recommended hospice care for Mark, as further treatment for the cancer was likely to be futile. Dr. Lin's note from that day noted that Mark was much more oriented to place and time and that his mental status seemed normal. Although he noted that morphine potentially affects cognitive functioning, Dr. Showel's notes from that day did not mention that Mark exhibited any confusion. He testified that any concerns about Mark's mental status would have subsided by March 15. A nurse's March 16 notes stated that Mark remained oriented and alert, and Dr. Showel did not note any confusion on Mark's part. On March 15 and 16, Dr. Showel discussed Mark's care with Mark himself, and a March 17 note by Dr. Lin stated

---

[2]We acknowledge that, after it decided *Belfield*, the supreme court approvingly cited *Mitchell*. See *Greathouse v. Vosburgh*, 19 Ill. 2d 555, 571-72 (1960). However, in that subsequent decision, the court did not discuss *Belfield*.

that Mark remained oriented and alert and that his attorneys were coming that day to meet with him.

¶ 108   Hynds's testimony likewise reflected that Mark was able to make his own decisions and directed the process. Hynds drafted several documents based on Dorothy's directions the prior day, but, on March 17, when he saw Mark at the hospital, Mark made all the decisions, recognized Hynds after 20 years, and recalled that Hynds wore hearing aids. Hynds did not speak privately to Mark, but he testified that most of the conversation he had was with Mark, who "told me what he wanted." Mark read the will along with Hynds, holding it in front of him, and they would discuss a paragraph. Mark directed Hynds to cross out a paragraph concerning petitioners' right of first refusal upon the transfer or sale of Mark's ownership interests in Coffman Truck Sales and Coffman Real Estate. Also, it was "key" for Mark that Dorothy, through her estate plan, direct the distribution of all assets from his estate. Once Hynds explained the tax consequences of using the trust for the limited power of appointment, Mark decided that this is what he wanted, even though this was not initially a critical issue for Dorothy, who, ultimately, acquiesced. When asked if Dorothy appeared to be overpowering Mark, Hynds testified that this was not the case because "Mark was the more dominant of the two in terms of the decision making that was involved." Barkley also testified that Mark appeared to understand the issues Hynds discussed with him and asked intelligent questions, and she said that it did not appear that Dorothy pressured Mark in any way.

¶ 109   Similarly, attorney Wilson testified that, in March or April 2018, he spoke to Mark about the mandatory buyout language in the Coffman Truck Sales shareholder agreement and "Mark knew what he was asking me." During the conversations with Mark, it did not appear to Wilson that Mark was being pressured into making changes to the family entities' documents. LeMaster

testified that, after March 17, she saw Mark and he did not express any concern about a will he had executed or state that he was pressured into something by Dorothy.

¶ 110   In summary, even if the presumption concerning a debilitated testator was a viable option, petitioners failed to establish a *prima facie* case that Mark was debilitated or infirm due to his illness.

¶ 111                                   III. CONCLUSION

¶ 112   For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 113   Affirmed.

---

*In re Estate of Coffman*, 2022 IL App (2d) 210053

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kendall County, No. 18-P-65; the Hon. Melissa S. Barnhart, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | David E. Lieberman, of Levin Schreder & Carey Ltd., of Chicago, and Elizabeth A. McKillip, of Levin Schreder & Carey Ltd., of Lisle, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Hal J. Wood, Matthew R. Barrett, and Michelle P. Lukic, of Horwood Marcus & Berk Chtrd., of Chicago, for appellee Dorothy Coffman. <br><br> No brief filed for other appellee. |

---